UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MICHELLE LEE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIV. ACTION NO.** |
| **v.** | : | |
| | : | |
| | : | |
| **PORTFOLIO ADVISORS, LLC,** | : | |
| **BRIAN MURPHY, JESSE EISENBERG,** | : | |
| **WILLIAM INDELICATO, and ADAM** | : | **JURY TRIAL DEMANDED** |
| **CLEMENS,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | **JUNE 27, 2022** |

<u>**COMPLAINT**</u>

1.   Asian Americans face a persistent pattern of discrimination in the workplace that is often

subtle.  Analysis of national EEOC workforce data found that Asian American

white-collar professionals are the least likely group to be promoted from individual

contributor roles into management – less likely than any other racial group.  White

professionals are nearly twice as likely to be promoted into management as their Asian

American counterparts.  Asian American employees experience the lowest return of

investment on their education and effort relative to others.  The type of glass ceiling that

Asian Americans, and especially women, face is sometimes easy to overlook.

Discrimination is cloaked under subjective factors like personality, leadership, likeability,

but the outcome is consistent: even where there is high educational attainment, extensive

hours worked, and substantive contributions and effort, Asian Americans almost never

rise to the top ranks of their companies.  Plaintiff Michelle Lee (hereinafter "Plaintiff")

brings this action against her employer Portfolio Advisors, LLC (hereinafter "PA" or

"Defendant") seeking money damages and other legal and equitable remedies against

said defendant for unlawfully discriminating against her in violation of 42 U.S.C. § 1981

and 42 U.S.C. § 2000e et.seq. Conn.Gen.Stat. § 46a-51 et. seq. on account of her race,

national origin, gender and religion, violating the Equal Pay Act, intentional infliction of

emotional distress and hostile work environment.  Plaintiff also brings this action against

PA employees, Brian Murphy, Jesse Eisenberg, William Indelicato and Adam Clemens

seeking money damages and other legal and equitable remedies against said defendants

for unlawfully discriminating against her because of her race and retaliating against her in

violation of 42 U.S.C. § 1981.

**I.**     **JURISDICTION, VENUE & PARTIES**

2.     This action is authorized and instituted pursuant to the 42 U.S.C. § 1981, 42 U.S.C. §

2000e et. seq., 29 U.S.C. § 206 and pursuant to 28 U.S.C. Sec. 451, 1331 and 1343(3)

and (4).  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.     All of the allegations made herein occurred within the territorial jurisdiction of the United

States District Court for the District of Connecticut.

4.     Plaintiff is resident of the State of Connecticut, having her principal residence in Darien,

Connecticut.

5.     Defendant Portfolio Advisors, LLC is a private Connecticut limited liability corporation,

with its headquarters located at 9 Old Kings Highway South, Darien, Connecticut, 06820

and conducts business within the District of Connecticut.

6.     Defendant Brian Murphy is the Managing Member and Managing Director employed by

PA working at PA's offices located at 9 Old Kings Highway South, Darien, Connecticut,

06820 and conducts business within the District of Connecticut.  Brian Murphy is

Plaintiff's decisionmaker.

7.      Defendant Jesse Eisenberg is the General Counsel and Managing Director employed by PA working at PA's offices located at 9 Old Kings Highway South, Darien, Connecticut, 06820 and conducts business within the District of Connecticut.  Jesse Eisenberg is Plaintiff's decisionmaker.

8.      Defendant William Indelicato is a Managing Director employed by PA working at PA's offices located at 9 Old Kings Highway South, Darien, Connecticut, 06820 and conducts business within the District of Connecticut.  William Indelicato is Plaintiff's decisionmaker.

9.      Defendant Adam Clemens is a Managing Director employed by PA working at PA's offices located at 9 Old Kings Highway South, Darien, Connecticut, 06820 and conducts business within the District of Connecticut.  Adam Clemens is Plaintiff's decisionmaker.

## II.    PROCEDURAL PREREQUISITES

10.     On March 23, 2022, Plaintiff filed a "dual charge" of discrimination against Defendant with the Boston Area Office of the Equal Employment Opportunity Commission (EEOC) and the Connecticut Human Rights Organization (CHRO).  A copy of the dual charge was sent to the Defendant on the same date.

11.     On March 30, 2022, Plaintiff received a Notice of Right to Sue letter from the EEOC regarding charge number 523-2022-02182.

12.     On April 28, 2022, Plaintiff received a Release of Jurisdiction from the CHRO regarding charge number 2220283.

13.     All administrative prerequisites to the institution of this action have been satisfied or will be satisfied upon filing an amended complaint.

**III.    FACTUAL BACKGROUND**

14.    Plaintiff is a 43-year-old, Asian American woman.  Her national origin is South Korean.

She graduated from Yale University in 2001 with multiple honors, including *summa cum*

*laude*, Phi Beta Kappa and the William Belknap Prize – a scholarship prize awarded to a

Yale graduate for academic excellence in biological sciences.  Following her

undergraduate education, she received a Juris Doctor degree from Yale Law School in

2005 with honors.  She then worked as a lawyer at Latham & Watkins, LLP for two

years.  In November 2007, she was hired by PA and has been an employee of PA since

then.

15.    As shown by Plaintiff's educational and work background prior to her employment with

PA, Plaintiff has always worked extremely hard on each task and responsibility at hand

and continued to do so as an employee of PA.

16.    PA is headquartered and located at 9 Old Kings Highway South, Darien, CT 06820 with

offices in Zurich, Switzerland and Hong Kong, and with additional satellite offices in

Singapore, Dallas, TX, Atlanta, GA and Boston, MA among others.

17.    Plaintiff is presently employed at PA as the General Counsel – Investments.  She was

initially hired as an Assistant General Counsel in 2007, promoted to Associate General

Counsel in 2010, then promoted to Deputy General Counsel in 2014, and finally

promoted to her current title of General Counsel – Investments in 2022.

18.    Plaintiff's contributions and value added to PA are significant.  Plaintiff has always been

qualified for her positions of employment with PA and has always received excellent

performance reviews.

19.    As the third employee to join PA's Legal Team in 2007, Plaintiff contributed to and
       increased the value of PA in significant ways in her nearly 15 years of service.  She has
       managed and been involved in the majority of investments of PA's sponsored funds and
       clients.  The investments which Plaintiff handled have generated hundreds of millions of
       dollars in profit, fees and carried interest for PA, and have disproportionately benefited
       PA's top management and group heads all of whom are white and many who are white
       Mormon men. Plaintiff is not Mormon.

20.    Plaintiff has been praised for her performance.  She received positive feedback from
       Jesse Eisenberg, PA's General Counsel and Plaintiff's direct supervisor. Over the years,
       Ms. Eisenberg has said to Plaintiff on multiple occasions comments such as, "You know
       that I think the world of you," "You are brilliant," "I rely and depend on you," "The sheer
       volume of work that crosses your desk is mind boggling," and "Your attention to detail,
       your ability to think critically and spot issues meet the highest levels."  Ms. Eisenberg
       made similar positive comments with respect to Plaintiff's performance in front of PA's
       Management Committee, and at Plaintiff's performance reviews, year after year.  Jorge
       Rossello, Timothy Henn and Patrick Gerbracht (Senior Vice Presidents and Managing
       Director who work closely with Plaintiff) told Plaintiff that the business people on the
       Secondaries Team have expressed concern that if Plaintiff or Jennifer Lew (Plaintiff's
       Co-General Counsel – Investments) were to leave PA, it would be a "complete shit show"
       as the closing of transactions would be seriously jeopardized.  At the 2021 annual
       presentation, numerous business teams gave Plaintiff shout-outs, thanking her and
       recognizing her value-add to getting large volumes of transactions done and that they
       could not have done it without her.

21.    For nearly 15 years, Plaintiff has worked after business hours, weekends and during

       vacation.  She also worked during her maternity leaves and made herself fully available

       to her team whenever they needed to reach her.  During her first three years at PA, she

       took only a couple of sick or personal days.  She rolled over vacation days most years

       because she was always so busy and could not take all of the vacation days allotted to her

       and often worked during her vacations.  She often sacrificed her time with her family and

       children during vacations and, especially during the month of December, in order to make

       sure that deadlines were met and that the work product was excellent.

22.    Plaintiff is married and a mother to three boys, ages 9, 8 and 6.

23.    Over the years, it has become clear to Plaintiff that PA's culture is toxic, racist and sexist.

       PA has treated its Mormon employees more favorably compared to non-Mormon

       employees who were similarly situated.  PA's discriminatory treatment against Plaintiff

       based on race, sex, gender, national origin and religion flow directly from the top and are

       illustrated in the ways in which PA's employees are hired, promoted, retained and

       compensated.  This discrimination has been continuous and ongoing.

24.    In November 2007, when Plaintiff first joined PA, Ms. Eisenberg told her that there was

       an interesting aspect to PA – that Brian Murphy was Mormon and that there was a

       disproportionately large number of Mormons at PA; that Paul Crotty was a Jehovah's

       Witness; and that William Indelicato was Catholic.  Mr. Murphy, Mr. Crotty and Mr.

       Indelicato constituted the Management Committee and were the most senior Managing

       Directors of PA.

25.    The vast majority of employees of PA have always been and are composed of white men,

       and as of February 2022, all of the Managing Directors ("MD" or "MDs", as applicable,

which is the highest level and title at PA) are men (33 men to be exact) except for a white

female MD on the business side and a white female MD named Jesse Eisenberg, the

General Counsel.  In the entire history of PA's existence, there has only been one other

female MD who is also white.  Even among the junior ranks on the business side, there

have been only a handful of women, many of whom left after two or three years of

working at PA.  Consistent with the past, currently there are only a couple of female

investment professionals in all of PA's Secondaries, Co-Investments, Credit Strategies,

Junior Debt, Senior Credit or the Registered Fund Teams even at the junior and

mid-levels.

26.     Every person in the Management Committee is white (Exhibit A).  The firm leadership is

all or predominantly white (Exhibit B).  The Group Heads are all or predominantly white

(Exhibit C). And the "C-Suite" is all white (Exhibit D).

27.     In the entire history of PA's existence, there has never been a single woman of color who

was either promoted to or hired at the MD level and title – the three female MDs listed

above are all white.  As shown in the examples below, white Mormon men have

disproportionately represented the top ranks of PA as they were hired, promoted and

retained unfairly because of their Mormon religion despite the lack of relevant experience

and strong performance, and at times, protected after committing grave offenses with

respect to certain individuals.  In 2020, PA hired three additional white Mormon men

("HLS" for the first letters of their last names, which is also how PA refers to these three

employees) who immediately joined the Management Committee and were hired as MDs.

PA's Management Committee has historically been composed of the highest ranking

members of the firm often leading the strategy, direction and future of the firm.  The

power dynamics of white MDs are evident on PA's own website

(https://www.portad.com/team).  PA's own advertisement of itself shows a clear picture –

not only is the hiring policy of PA abysmal in terms of attracting women and especially

women of color, but the potential growth and promotion of women and especially women

of color in leadership roles is discriminatory.

SEX DISCRIMINATION, HARASSMENT AND HOSTILE WORK ENVIRONMENT

28.  During her first year at PA, Plaintiff was sexually harassed by "Mr. A", an investment

professional who joined PA's Secondaries and Co-Investments Teams two months after

Plaintiff.  Mr. A was recently married.  After a couple of months of what Plaintiff

perceived as a purely platonic co-worker relationship, Plaintiff and Mr. A met up one

evening for drinks across from his apartment building.  Plaintiff and Mr. A were sitting

across the table and right as they were saying goodbye, Mr. A grabbed Plaintiff's hand

from across the table, pulled her in and kissed her on the mouth for several seconds.

Plaintiff was in complete shock and pulled away.  He then immediately said "You know

that you kissed me!" and kept repeating the statement.  Plaintiff denied it as it was a

complete lie.  He had pulled her toward him so hard that her bottom was lifted off the seat

and she was practically standing as she was forced to lean across the table.  There is no

way Plaintiff could have lifted Mr. A or pulled him in as he is much taller and stronger

than her 110-lb frame.  When they paid the check and went outside, Mr. A was begging

Plaintiff to come upstairs to his apartment, telling her that his wife was away on a

business trip.  He said that he had never done this before, that he had never felt this way

before.  Plaintiff declined vehemently saying "Are you crazy?  How could you do this to

your wife?" and left him standing there.

29.     Subsequently at the office, Plaintiff reiterated her earlier position and made it crystal clear to Mr. A that she did not want to continue anything with him other than a distant professional relationship.  She also told him that she was not going to say anything to anyone and asked him to do the same.  Mr. A agreed to all of this and Plaintiff and Mr. A remained cordial in the office.  A few weeks later, Plaintiff was heading out to the train station to commute back home.  Mr. A offered to give Plaintiff a ride home and affirmed that everything was totally cool between the two of them.  Plaintiff naively believed him and took upon his offer.  At some point during the ride, Mr. A pulled the car over and kissed Plaintiff for the second time.  Plaintiff pushed him away and told him that she did not want to be involved with him in any way other than as co-workers.  She felt disgusted and again asked how he could do this to his newly-wed wife.

30.     After the second incident of kissing, Plaintiff decided never to be alone with Mr. A again. Mr. A constantly emailed or texted Plaintiff during work asking her to take a walk, grab coffee or lunch.  Plaintiff declined every time.  Once Mr. A realized that Plaintiff was never going to be alone with him again, he began to retaliate against her.  For example, Mr. A wrote an email to his then supervisor saying that Plaintiff was not communicating important information and continuing to magnify issues unnecessarily, which email was then forwarded to Plaintiff by his supervisor.  Plaintiff approached Mr. A in a conference room and asked him to explain the email.  He immediately started yelling and saying "You want an explanation?  [My supervisor] is a fucking idiot!  That's what."  Plaintiff tried to argue the merits of the business points in the email but quickly realized that he was not interested in any rational conversation.  In order to protect herself from further reprisal, Plaintiff forwarded the email chain to Ms. Eisenberg so that she was aware of the

specific situation regarding the deal.  At this time, Plaintiff did not say anything about the sexual harassment to Ms. Eisenberg or anyone else.

31.     In December 2008, Plaintiff received her first formal annual performance review.  Mr. Crotty, Mr. Indelicato and Ms. Eisenberg were present.  Plaintiff received stellar reviews with respect to her work product, work ethic, the amount of volume she handled and her added value to the firm.  The only criticism was that she was "difficult to work with".  When Plaintiff asked who said this, Mr. Crotty responded Mr. A and "others" but when Plaintiff inquired further, none of Mr. Crotty, Mr. Indelicato or Ms. Eisenberg could produce any other specific name.  They never asked for Plaintiff's side of the story or why someone would think that she is difficult to work with.  Plaintiff felt trapped, helpless and alone.

32.     Despite the comment that Plaintiff was "difficult to work with", given that she had stellar reviews otherwise, and the firm had done so well, Plaintiff had high hopes for a very good bonus as her written offer letter had stated that her bonus would range between 33-100% of her base salary depending on her performance and the performance of the firm.  Nonetheless, Plaintiff received below the bottom range of her bonus - 26% of her base salary.  This was an adverse employment action.  Plaintiff approached Mr. Crotty who had signed the offer letter and asked for an explanation.  Mr. Crotty simply said that the 33-100% bonus range must have been a mistake and that because he had recently come out of surgery, he must not have read it carefully or was not paying close attention.  Given the firm's performance, and Plaintiff's own performance that year, on which the bonus depended, Plaintiff deserved a bonus that was closer to 100% of her base salary as written in the offer letter and not in the bottom range.  Plaintiff had worked extremely

hard and had spent extra hours on evenings and weekends to bring herself up to speed at work.  On information and belief, other similarly situated white male employees were given larger bonuses than Plaintiff.  In addition, a similarly situated white employee who joined PA only a little over a year before Plaintiff consistently received more than 100% of salary as a cash bonus, and salary that was also significantly higher than that of Plaintiff.

33.   Plaintiff continued to suffer further incidents of sexual harassment and retaliation from Mr. A while at work.  He would make comments like, "No wonder people are checking you out at work - look at what you're wearing."  Plaintiff was wearing a brown turtleneck sweater dress.

34.   Plaintiff and Mr. A had to work closely on secondary and co-investment deals and Plaintiff felt distressed when she had to see him or talk to him.  She dreaded seeing Mr. A, and actively took measures to avoid uncomfortable contact.  She was also constantly in fear because of the negative remarks of her not being "user-friendly" or easy to work with.  She was in fear of being harassed further by Mr. A.  This was a hostile work environment.

35.   "Mr. B", a Managing Director and Mr. A's direct supervisor would often look at Plaintiff up and down whenever she went to his office to obtain his signature or discuss a business issue.  Mr. B made it very obvious because his head would literally bob up and down as he looked at her – he did not even bother to move just his eyes.  Plaintiff also heard comments from others saying that Mr. B said that he thinks that "[A] is in love with Michelle", which was humiliating to Plaintiff that people were gossiping about her and

Mr. A in this manner.  This was a hostile act, and Plaintiff was harassed and discriminated against because she is female.

36.    Plaintiff was also approached by another PA employee ("Mr. C") as she was heading out to catch her train home.  He would not leave her cubicle until Plaintiff agreed to have dinner with him.  He must have realized how uncomfortable she was on the train ride into NYC because he called another friend to join them.  After that evening, Plaintiff tried to avoid Mr. C in person and conducted most of her business with him via email and telephone calls.  From then on, at work, Plaintiff heard that people referred to her as "ice queen".  Defendants did not treat other similarly situated employees who are male in this same manner.  Plaintiff was treated differently because she is female.

37.    "Mr. E", a Managing Director, during a meeting, touched Plaintiff's fingers which were resting on her upper thigh under the table. He whispered to Plaintiff, "Wow, I didn't know that kind of nail polish color existed".  Plaintiff felt violated by the unwanted touch.  On a couple of other occasions when Mr. E came by Plaintiff's cubicle and they were alone, he massaged her shoulders as he approached her from the back without her awareness of his approach, touching her without her permission.

38.    Mr. A's retaliatory and unwanted comments continued.  In December 2010, Plaintiff notified her co-workers that she had become engaged to her husband.  Even thereafter, she received comments from fellow white male employees saying, "Oh, for sure you're not going to work anymore since you don't need to work."  On another phone call, Mr. E also talked about how the dating scene in his area was great and about how easy it was to get women in bed with him.  At least on two occasions, Mr. E also advised Plaintiff not to get married because married life sucks and if she ever divorced, it would decimate her

financially.  Plaintiff was discriminated against because of her sex and gender.  Plaintiff suffered a hostile work environment.

39.     Plaintiff was suffering emotional distress because of the continuous onslaught of sexually charged comments and hostility from her co-workers.  Therefore, Plaintiff reported the sexual harassment and gender discrimination to Ms. Eisenberg and about the sexual harassment incidents with Mr. A because Plaintiff felt that she had to at least put a stop to Mr. A's retaliation against her on her performance reviews regarding the "difficult to work with" types of comments.  To Plaintiff's knowledge, Ms. Eisenberg did not do or say anything to anyone else.  On information and belief, Mr. A was not disciplined for his harassment towards Plaintiff.

40.     Throughout her tenure, despite receiving positive praise for her work product and performance, she was criticized for allegedly having an abrasive tone.  The only named complainant was Mr. A.  Ms. Eisenberg did not defend Plaintiff with respect to this negative aspect of her review, even after Plaintiff had told her about Mr. A's sexual harassment.  Instead, Ms. Eisenberg advised her not to appear defensive and just to be receptive.

RACE DISCRIMINATION

41.     In one meeting, "Mr. F", a Managing Director and "Mr. G", who is now a Managing Director, were discussing an investment opportunity in a Chinese company that had a Chinese name.  Mr. B then cackled loudly in front of the entire room and said "ching chong ching chong" and no one said anything.  Plaintiff was offended that Mr. B made such a racist comment and that no one said or did anything to reprimand him.  This was a hostile act and Plaintiff was discriminated against because of her race.

42.     At a PA-sponsored luncheon, "H", a Managing Director at PA at the time, made a discriminatory comment about another Asian American employee.  Based on her negative experience with that Asian American, H stated that H would not hire another Korean guy again if H could help it.  Subsequently, H told Plaintiff that this same Asian American employee had only gotten the job with PA and later at a bank as a Managing Director only because of his Korean buddy at a PE firm.  H also described Darien as becoming more diverse and that "more people like you" were moving into Darien and that there was an "Oriental" family that moved near H.  Plaintiff was offended and felt racially targeted by these comments and the use of the word "Oriental" which has deep and demeaning historical roots.  These comments were hostile and caused Plaintiff continuous stress and anxiety.

43.     PA subjected Plaintiff to disparate treatment with respect to travel and expenses compared to similarly situated employees who were white males.  She was pressured to take economy class and shuttle to her hotel while her white male counterparts were offered business class without question, spent lavishly on meals and took taxis.  Plaintiff was treated differently and discriminated against because of her race and gender.

PREGNANCY DISCRIMINATION

44.     PA also discriminated against Plaintiff based on her pregnancy and demeaned her by offensive comments regarding her pregnancy.  In 2012, the first time Plaintiff ran into Mr. E after disclosing to the firm that she was pregnant, he asked, "Didn't you just get married?  He proceeded to try to count back the months.  Plaintiff was offended as he was clearly trying to suggest that she had gotten pregnant before getting married.

45.     After close to five years working for PA, Plaintiff took her first maternity leave for two

months per PA's maternity leave policy.  Plaintiff worked until her delivery date, and

continued to work throughout her maternity leave.  She reviewed her emails daily and

spoke weekly with "Mr. I", an Associate General Counsel who worked with her on

investment transactions.  When Mr. Crotty walked Plaintiff through her compensation at

the end of 2012, he said to her in person that her bonus was cut because she went on

maternity leave and that it was only fair that those who covered for her were

compensated better while her pay was reduced accordingly.  Plaintiff was discriminated

against because of her gender and her pregnancy.  Plaintiff reported Crotty's statement to

Ms. Eisenberg. Plaintiff was compensated lower relative to a similarly situated white

employee, and was discriminated against because of her race and gender.

RACE AND GENDER DISCRIMINATION RELATED TO
COMPENSATION, VIOLATION OF THE EQUAL PAY ACT

46.     Plaintiff approached Ms. Eisenberg and asked about receiving a raise.  Plaintiff's raises in

prior years had been approximately 4% only and she knew that she was being paid under

market and was paid less than her white counterparts at PA.  Plaintiff told Ms. Eisenberg

that she believed that she was not being paid fairly because in part she was female and

Asian.  Ms. Eisenberg then talked to Mr. Crotty and the Management Committee about

her request for a raise.  A few days later Plaintiff spoke with Mr. Crotty, and Mr. Crotty

said to her that Ms. Eisenberg had said that Plaintiff had "ambushed her" and cornered

her about Plaintiff's compensation.  Plaintiff is aware that a similarly situated white

employee, known to be difficult to work with, was getting significant raises since the

time Plaintiff was hired by PA, and Plaintiff could not understand why she was not

getting any raise other than adjustment for inflation, when year after year she only

received stellar reviews with the exception of "being difficult to work with" type of criticism.  In another meeting with Mr. Crotty and Ms. Eisenberg, Plaintiff told Mr. Crotty that Plaintiff had been working independently of Ms. Eisenberg on the transactions for the past several years and that her responsibilities had grown significantly over time. Plaintiff asked for a raise both for her increased role and responsibilities and a commitment to work longer hours.  Ms. Eisenberg reprimanded her after the meeting saying that she should not have asked Mr. Crotty for a raise.  Plaintiff told Ms. Eisenberg that she was paid under market and that she wanted fair and equal pay.

47.    Plaintiff also discovered that "Mr. J", a white male employee who had the same title as Plaintiff, and who was hired by PA only about one month before Plaintiff, was receiving higher percentages of carry interests and higher salary and bonus than Plaintiff.  Plaintiff knows this because Mr. J showed her his numbers.  Plaintiff was discriminated against and treated differently because she is female and Asian.  Plaintiff received less salary, bonus and GP carry interests than white male employees because she is female and Asian.

48.    Plaintiff was also unfairly compensated in comparison to a white, male Mormon who was hired as an analyst, the most junior level at the firm, shortly after Plaintiff was hired. However, on information and belief, the junior analyst was promoted at a much faster rate than she was, granted PA equity ownership again at some point and received a higher rate of increase in compensation than Plaintiff.  The disparate treatment follows the pattern and practice of PA's discriminatory policies: the analyst is white, male and Mormon and Plaintiff is Asian, female and non-Mormon.

49.     Plaintiff continues to suffer race and sex discrimination at work in comparison to the

present day relative to others.  While Plaintiff's attempt to seek fair wages was

characterized as an "ambush" or simply rejected as something that will "never happen at

PA" and while Plaintiff was excluded from any meaningful promotion other than with

title and relatively lower increases in pay compared to similarly situated employees who

are white, male and/or Mormon, a white male was promoted to Chief Compliance Officer

("CCO"), even though he was only hired less than a year prior as a Senior Compliance

Associate.  Plaintiff was never given an opportunity or an option to take on this role of

CCO even though she was qualified to do so.

50.     The CCO performed poorly but continued to be promoted and received PA equity.

Plaintiff raised these concerns regarding the CCO with Ms. Eisenberg and the

Management Committee  and its impact on PA.  Plaintiff also told Ms. Eisenberg that this

double standard applied to people such as the CCO was demoralizing to the rest of the

team.  The disparate treatment follows the pattern and practice of PA's discriminatory

policies between a white male and an Asian female.

51.     To this day, Plaintiff continues to face discrimination, not receiving equal pay in

comparison to white men employed by PA.  On information and belief, Plaintiff alleges

that the discrepancy of compensation (including salary, bonus, PA equity units and GP

carry interests) between white versus non-white, male versus female and Mormon versus

non-Mormon is discriminatory.

52.     Plaintiff continued to suffer race discrimination at work.  PA has a pattern and practice of

discriminating against Asians, in favor of its white employees.  Just as Plaintiff was

discriminated against, similar types of discrimination were evident in various aspects of

PA's business.  A white male employee was promoted to Managing Director and was

made the Head of the Asia Team and the Hong Kong office.  Despite having the

opportunity to promote any number of the Asian employees who PA hired from United

Overseas Bank and who were instrumental to the launch of PA's first three Asia focused

funds, spoke fluent Chinese, and understood the Asian culture significantly better than

the white male as they were born and raised in Asian cultures, the white male was made

head of the entire Asia Team.  "Ms. K", another Chinese-American woman who joined

PA, who spoke fluent English and Chinese, was another strong and viable candidate to

lead the Asia Team.  She had been employed by PA longer than the white male but was

promoted to Senior Associate later than the white male.  Instead, despite her excellent

work product and work ethic and her tenure with PA, she was denied promotion and

compensation based on her race and sex, and her career stagnated due to PA's

discrimination based on race and sex while the white male employee was promoted year

after year moving up from an Associate to Managing Director within seven years.

53.    Plaintiff reported sexual harassment again to Ms. Eisenberg.  Plaintiff  reported the sexual

harassment Mr. A inflicted on Plaintiff with the Management Committee.  Plaintiff went

to Ms. Eisenberg's office, told her of Plaintiff's decision and went to Mr. Crotty's office

together.  Plaintiff told them that Mr. A sexually harassed Plaintiff and that he continued

to retaliate.  Mr. Crotty listened and apologized specifically about how he recalled

himself commenting several times at Plaintiff's performance reviews, instructing her to

go to Mr. A's office to do business with him in person instead of emailing or calling and

that he now understood why Plaintiff had been so reluctant.  Plaintiff told Mr. Crotty that

she wished to go on record to prevent harassment and discrimination.  To Plaintiff's

knowledge, there was no investigation and no disciplinary action for Mr. A.  Defendants never spoke with or asked Plaintiff about it ever again.  Not only had Mr. A subjected Plaintiff to discrimination and retaliation, but on information and belief, Mr. A sexually harassed another employee.  Defendants discriminated against Plaintiff based on her race and gender.

54.     Plaintiff observed the CCO of the firm witness but ignore employees disparaging people who make sexual harassment allegations.  PA has a pattern and practice of discriminating against female employees and allowing a hostile environment to thrive.

55.     Close to her delivery date, Plaintiff spoke with Mr. Murphy to pre-empt another reduction in her bonus.  In Plaintiff's self-evaluation that year, she wrote that it was disappointing to have her bonus cut when she took her first maternity leave, but as she had done during her first maternity leave, she was reviewing her emails every day, made herself fully available, stayed in regular communications and kept abreast of the transactions that were in process during her second maternity leave.  She stated that she would be very disappointed if her bonus were to be cut again this year given that she went above and beyond what was expected of someone on such leave and was still very much involved in her regular set of responsibilities.  Ms. Eisenberg called Plaintiff into her office upon reading Plaintiff's self-evaluation, furious about these comments and demanded that going forward, she would have the right to review and approve Plaintiff's self-evaluation before submission to the Management Committee.  While PA did not reduce Plaintiff's bonus during her second or third maternity leaves, it was in stark contrast to at least one other similarly situated employee who was not Asian American who received increases in

salary and bonus compensation during her maternity leaves.  PA discriminated against
Plaintiff by giving her low bonuses compared to a similarly situated white woman.

56.    While Plaintiff had been promoted previously from Assistant General Counsel to
Associate General Counsel and to Deputy General Counsel, they were promotions in title
only, with increases in compensation that were not comparable to others similarly
situated and no offer to buy equity in PA, while male employees were promoted to Senior
Vice Presidents, received benefits including the opportunity to buy equity in PA, almost
on a lockstep basis.  A meaningful and fair promotion to Deputy General Counsel would
have included an opportunity to buy PA equity, and Plaintiff would have received this
opportunity to buy equity had Plaintiff been promoted in line with similarly situated white
male and especially white male Mormon employees of PA, but this benefit was not
offered to Plaintiff with her promotions.  At the same time Plaintiff was promoted to
Deputy General Counsel, a similarly situated white female was promoted to Managing
Director and received additional opportunity to buy PA equity.  After seeing so many
white employees and especially white male employees get promoted to SVP and MD,
Plaintiff approached Mr. Murphy about her future with PA and asked Mr. Murphy
whether she would ever be considered for Managing Director given the history of her
commitment to the firm and consistently excellent work.  Mr. Murphy stated very clearly
to Plaintiff that she will never be a Managing Director.  Plaintiff was discriminated
against because of her race.  Plaintiff was treated differently than similarly situated
non-Asian employees.

57.    Plaintiff also suffered from racist comments by white employees.  Some were explicit
and some were implications of inferiority and distrust of other races.  Plaintiff recalls Mr.

Murphy making broad generalizations about what the Japanese are like after one of his marketing trips to Japan with Mr. L.  Mr. Murphy commented on how the Japanese are so different in mannerisms from Americans and how they are so polite and deferential to you in person but that you never know what they are really thinking or what they will do the minute you turn your back.  After a trip to South America, Mr. Murphy also claimed that South Americans are completely incapable of being on time.

58.    Mr. Indelicato in trying to recollect a person's name he met at an annual meeting said it was some sort of an "Oriental" name like Wang or Wu.  Plaintiff was offended by the "Oriental" comment.  PA has a pattern and practice of discriminating against Asian employees and discriminated against Plaintiff because she is Asian.

59.    PA continued its pattern and practice of discriminating against its employees who are not Mormon, including Plaintiff.  After H announced H's retirement from PA, Plaintiff told H that Plaintiff would miss H when H leaves.  H said "I certainly am not going to miss this place.  For years, Brian has done whatever he wants and he pays people however the hell he wants.  He pressures me to hire his Mormon people from the Marketing Team who have no experience in primary investments and I have to keep training them up only for them to leave."  PA has a pattern and practice of discriminating against employees who are not Mormon; white Mormon employees have always been hired, paid and promoted on more favorable terms than non-Mormons.

60.    Plaintiff again suffered pregnancy discrimination and harassment when she became pregnant with her third child.  She told Mr. Crotty the news.  Mr. Crotty said to Plaintiff "Well, aren't you fertile" as he chuckled, which Plaintiff found to be a demeaning way to describe her pregnancy, as if she were a breeding animal.

61.  Plaintiff continued to suffer race and sex discrimination and harassment at work.  At a PA year-end firm-wide presentation, Mr. L a white, male, Mormon Managing Director who had been hired solely to raise money in Japan gave a presentation that had the Hello Kitty character (a very popular Japanese children's anime character) on multiple slides.  On one slide, a Hello Kitty was dressed in an S&M outfit and on the final slide, a Hello Kitty was facing backwards and bent over in a bow (the traditional way of greeting and showing respect in Japan) with the Japanese "rising sun" rays radiating out of its anus.  The "rising sun" symbol has often been and still is equated with the Japanese version of the Swastika as it was used extensively by the Japanese army during WWII, and many Asian countries who suffered under Japanese war crimes had since protested to ban the "rising sun" symbol and flag.  Plaintiff was highly offended by this presentation and emotionally distraught.  Plaintiff had numerous complaints and discussions about the presentation.

62.  Mr. L had previously used Hello Kitty characters inappropriately in prior annual presentations and made sweeping generalizations about the Japanese people and Japan and called himself an expert in anything to do with Japan.  Mr. L continued as a Managing Director.  PA has a pattern and practice of discriminating against its Asian employees.

63.  Mr. L had also commented on how beautiful Plaintiff's scarf was, reached over and petted her and her scarf.  This was sexual harassment and an unwanted touching.

64.  Other female employees left the firm because of discrepancies between the amounts of GP carry interests offered amongst certain members of the same team at the same level.  PA has a pattern and practice of discriminating against its employees based on their gender.

65.    Other Asian employees related their stories about discriminatory treatment to Plaintiff.

66.    Other diverse employees were harassed.  One of the few Hispanic employees was greeted with a "Gracias," in a way Caucasian employees would not have been.

67.    "Mr. M" told Plaintiff that his son was playing on the Harvard tennis team, and stated, "My son and one other white kid are the only 'round-eyes' on the team. All the others are Asian."  After he left, Plaintiff and the other Legal Team member who was present talked about how racist his comment was: round-eye versus what?  Slanted-eye?  PA has a pattern and practice of discriminating against employees because of their race.  Plaintiff was discriminated against because she is Asian.

68.    In 2020, Mr. Murphy hired Mr. Higbee, Mr. Lindberg and Mr. Sloan.  They are all white Mormon men, and Mr. Murphy made them a part of the Management Committee.  They are referred by employees as "HLS."  It is common knowledge among PA's employees that Mormon employees get special treatment/protection and higher compensation relative to their value-add.

69.    On a weekly firm-wide Zoom call in early 2021, when an employee asked Mr. Murphy which COVID vaccine he had received, Mr. Murphy replied, "The cheap one, the one made in China".  Plaintiff was offended by the comment and felt threatened by Mr. Murphy's remarks.  PA has a pattern and practice of discriminating against employees because of their race and especially against Asians.

70.    Another Asian American employee, "Mr. N" was discriminated against for his Chinese accent.  Colleagues reported that they did not want Mr. N assigned to any of their deals because "he did not present well".  When asked what they meant by that, "like was he saying something inaccurate?  Not wording things correctly?  Not describing the

investment well?," the response was simply that "we just don't want him on our deals. He does not present well".  PA has a pattern and practice of discriminating against employees because of their race.

71.      In December 2021, Mr. Murphy called Plaintiff to tell her that Plaintiff and Ms. Lew were being promoted to become the Co-Heads of a separate legal group, the "Investments Legal Team" that would focus on handling all of PA's investments, that they would be made equal to Ms. Eisenberg and that they would report directly to the Management Committee and no longer to Ms. Eisenberg.  When Plaintiff and Ms. Lew asked for the title of "General Counsel – Investments", Mr. Murphy and the Management Committee approved, stating that it was an important signaling effect to show that they were no longer subordinate to Ms. Eisenberg and confirmed in writing that they were being promoted to the SVP level.  A promotion to SVP meant that the SVP was offered an opportunity to buy PA equity.

72.      While Plaintiff was thrilled about the promotion to General Counsel – Investments, this promotion was long overdue given her tenure, performance and contribution to PA. While it took Plaintiff 14 years to be promoted to SVP, a similarly situated white female employee had been promoted to Managing Director only after eight years at PA.  White, male employees, especially white, male and Mormon employees were promoted almost in lockstep toward MD at a much faster pace compared to Plaintiff who was previously told she would never become MD; if the employee was a white male and stayed employed with PA long enough, the employee would eventually make MD regardless of the employee's performance or contribution to PA.  Contrary to such progression, for Plaintiff this was the first meaningful promotion that she had received as it came with her

first opportunity to buy PA equity since its restructure and obtaining independence from

Ms. Eisenberg.

73.  On January 11, 2022, Plaintiff and other promotees attended a presentation relating to

compensation.

74.  Plaintiff subsequently emailed Ms. Johnson and asked her to confirm her certain

representations she had made, which Ms. Johnson confirmed.  When Plaintiff pointedly

asked Mr. Murphy a related question, she was informed she had "pissed him off."

75.  On February 17, 2022, Mr. Murphy made threats to Plaintiff:

Michelle,

It has been brought to my attention that you have threatened legal action against
PA on several occasions in the past few months. This is not the behavior the MC
expects from leaders of the firm. It must stop immediately! We expect our leaders
to be loyal to the firm, set examples of appropriate behavior and not be so selfish.
Tantrums and threats when you don't get your way will not be tolerated. If this is
too much to ask and this recent promotion has gone to your head and you are no
longer happy, I am happy to have you step down and work for Jen.

On behalf of the MC
Brian

76.  Mr. Murphy singled out Plaintiff and retaliated with insults and threats, discriminating

against her on the basis of her race and gender.

77.  Not only did Mr. Murphy single out Plaintiff among the recently promoted SVPs, PA

singled out Plaintiff in continuous and ongoing discriminatory actions by failing to

promote Plaintiff to SVP and offer of PA equity year after year compared to similarly

situated white men and women employees, especially white male Mormon employees

over the years.  Other white, male and/or Mormon employees were promoted to SVP

significantly earlier and at a faster pace than Plaintiff, and to Managing Director, while it

took Plaintiff over 14 years to get promoted to SVP (with previous statement from Mr.

Murphy that she will never be promoted to Managing Director), and Plaintiff was then further singled out with respect to the PA equity offer among the recently promoted SVP cohort.  Plaintiff was denied an opportunity to participate in purchasing PA equity at an appropriate time because PA discriminated against her based on race, sex and religion on continuous and ongoing basis.

78.    In February, 2022, Plaintiff asked "O" about PA's Diversity and Inclusion Committee ("D&I Committee") that was formed in July 2020.  Plaintiff asked if the D&I Committee was really planning or doing anything concrete or if it were just for show, given that the industry expected at least some support for diversity and inclusion.  O responded that the head of the D&I Committee had drafted a slate of initiatives but that they were going nowhere, that no one was paying any attention or taking action.  O expressed that PA should stop hiring under-qualified employees who obtained favorable treatment because of their Mormon affiliation, and hire people who were actually good at their job.  PA has a pattern and practice of discriminating against its employees because of their race.  Plaintiff was discriminated against because of her race and gender.

## HOSTILE WORK ENVIRONMENT

79.    Over the years Plaintiff has suffered a hostile work environment at PA.  She has suffered ongoing race, sex and religious discrimination and has reported the same to her direct report and supervisor, Ms. Eisenberg.  This discrimination caused an ongoing and continuous hostile work environment.  Ms. Eisenberg took no action to resolve the discrimination and instead promoted and escalated the hostile work environment.  Plaintiff felt that she was trapped in an impossible situation given that Ms. Eisenberg herself was one of the key individuals who subjected Plaintiff to continuous and ongoing

discriminatory actions based on Plaintiff's gender and race.  The Management Committee

and PA have known for many years and fielded numerous complaints about Ms.

Eisenberg's performance and behavior.  The Management Committee failed to control

any of Ms. Eisenberg's behavior and enabled her to create a continuous and ongoing

hostile work environment for Plaintiff.

80.     Ms. Eisenberg singled out Plaintiff because of her race and gender and subjected Plaintiff

to harsher standards and constant abuse compared to similarly situated white, male and/or

Mormon employees.  Over the years, Ms. Eisenberg has screamed and yelled at Plaintiff

for no good reason, cursed at Plaintiff, constantly cursed out loud so that people around

her office can hear her exclaim "shit!" and "fuck!"  When Plaintiff would go to Ms.

Eisenberg's office because Plaintiff needed her to respond in order to move forward with

a legal matter, Ms. Eisenberg would look up from her desk after making Plaintiff wait

there for several minutes, and say "What!" as she glared at Plaintiff or wave her off

without a word.  Ms. Eisenberg has told Plaintiff that she's "very disappointed in"

Plaintiff over the slightest mistakes, has threatened to terminate Plaintiff, has taken credit

for Plaintiff's work, has given Plaintiff impossible tasks (e.g., subjecting Plaintiff to

impossible, false internal deadlines), or set up Plaintiff for failure (e.g., instructing

Plaintiff to do what the investment professionals had told Plaintiff not to do behind their

back).  Ms. Eisenberg has gossiped about Plaintiff regarding very inappropriate topics.

For example, Ms. Eisenberg told Mr. Crotty about a rumor a PA employee spread about

Plaintiff - that Plaintiff allegedly was dirty and messy when using the bathroom.  This

rumor also spread about the only other Asian woman in the office.  Mr. Crotty said that

Ms. Eisenberg had told him about the bathroom rumor and Ms. Eisenberg told him to

shut up as she knew how humiliating that would be for Plaintiff especially knowing that her own boss was talking behind her back with Mr. Crotty about something so crass. This contributed to an ongoing and continuous hostile work environment.

81.    There was never a dedicated human resources person at PA.  Prior to Mr. Crotty's retirement, he took on the human resources ("HR") role along with his actual job responsibilities, but PA employees told Plaintiff that Mr. Crotty loved Ms. Eisenberg and treated her like his daughter.  Since Mr. Crotty's retirement, either Ms. Johnson or Mr. Dwyer who have had no training or experience in HR were filling the gap.  A former executive assistant to HLS with no experience in HR, took over the role in 2020 which led to disastrous results on the most basic HR functions such as payroll and benefits. Apart from Plaintiff's frayed relationship with Mr. Dwyer from working together, Ms. Johnson also said that Mr. Dwyer had "diarrhea mouth" and to never trust him with any information.  At the performance reviews, Ms. Eisenberg sat next to the Management Committee members and Plaintiff could not voice anything related to Ms. Eisenberg, even though Ms. Eisenberg was a toxic supervisor.  Mr. Murphy also said to Plaintiff that as much as Ms. Eisenberg drove him crazy, that Ms. Eisenberg was one of his most trusted advisors, and so Plaintiff knew that her words would fall on deaf ears if she spoke negatively about Ms. Eisenberg in any way and that Ms. Eisenberg would make her experience at PA even more intolerable and seek to fire her.

82.    Mr. Murphy's threatening February 2022 emails were not the first time Plaintiff encountered his intimidating behavior.  One SVP who is not of the Mormon faith told Plaintiff in January 2022 that even though he had worked at PA for almost eight years, he has never had a meaningful or substantive conversation with Mr. Murphy.  He then said

that there was a saying at PA that those who are not "in with Brian" will have their first substantive conversation with Mr. Murphy when they leave PA.

83.    As a result of the ongoing hostile work environment and race, sex and religious discrimination Plaintiff has endured, Plaintiff suffers from continuous, outrageous and severe emotional distress.  The ongoing discrimination triggered Plaintiff's sexual harassment experience time after time, making her suffer anew, and the anguish the Management Committee, Ms. Eisenberg and others at PA have caused her to suffer multiple physical ailments, to be physically sick, to be sleepless and irritable, have interfered with her relationships as a mother and wife, and have caused an anxiety-ridden heaviness that is only getting worse.  Plaintiff's health has deteriorated as a result of working in such a toxic environment.  From about 2020-2022, Plaintiff worked harder than ever, working nights and weekends and at times working 12-hour days as the volume of work increased drastically.  In addition, PA instituted a 360 degree review in 2021 for the first time that involved written reviews.  While Group Heads were required to provide a review by August 2021, Ms. Eisenberg would not give Plaintiff her review no matter how many times Plaintiff followed up with her and despite having given everyone else on the Legal Team their review.  Plaintiff finally asked Ms. Eisenberg if there was a problem and if there was something Plaintiff should be concerned about. Ms. Eisenberg called Plaintiff in early December 2021 and told her that her reviews were "amazing" and "very impressive" but that there was some feeling or a sense that Plaintiff was not on top of her game anymore, that somehow, she was not as "gung-ho" about things.  Plaintiff was so upset at this feedback and asked her who said this to her, as Plaintiff had given her all especially this past year.  Plaintiff told Ms. Eisenberg that if her

best was not enough then Plaintiff might as well just resign.  Then Ms. Eisenberg quickly

backtracked and said that it was only her opinion and began to lavish compliments on

Plaintiff.  A couple of weeks later, the day before Mr. Murphy called Plaintiff to let her

know that she was getting promoted to General Counsel and SVP, Ms. Eisenberg called

Plaintiff, saying that someone at PA's holiday party had told her that Plaintiff was not

adding value, was just an expensive paper pusher, that she punted all the difficult

questions as business issues and would not weigh in.  Ms. Eisenberg said that she was

concerned that Mr. Murphy had scheduled the call with Plaintiff to discuss these matters.

Plaintiff was wrecked with worry, upset about the unfair criticisms, and spent hours

preparing to defend herself for the upcoming call with Mr. Murphy.  It turned out, as

stated above, Mr. Murphy called to promote Plaintiff – he did not mention anything

negative whatsoever on the call.  After Plaintiff's call with Mr. Murphy, Ms. Eisenberg

called and texted her numerous times within hours.  Plaintiff knows that this suggestion

to bifurcate the Legal Team into fund formation/PA corporate matters under Ms.

Eisenberg and a separate Investments Legal Team had been proposed in prior years but

had not happened because Ms. Eisenberg vehemently objected to the proposal.  Plaintiff

believes that Ms. Eisenberg knew that Mr. Murphy was calling Plaintiff with the

promotion, but intentionally sought to undermine Plaintiff in her desperation to block the

promotion in any way she could.  This was a hostile act.  Plaintiff suffered a hostile work

environment and Plaintiff believes Ms. Eisenberg targeted her by withholding the

mandatory annual review and seeking to manipulate and block her promotion because of

Plaintiff's race.

84.     Plaintiff was also told by various PA employees that Ms. Eisenberg was adamantly
        against Plaintiff's promotion to General Counsel.  Even after Plaintiff was promoted over
        Ms. Eisenberg's objection, "Ms. R" told Plaintiff that Ms. Eisenberg called her and kept
        asking over and over again "Don't you think that Michelle doesn't have the 'right tone' to
        be GC?"  And Ms. R defended Plaintiff, saying "No, I really think highly of Michelle and
        her work and everyone who works with her likes and enjoys working with her."  The rest
        of the Legal Team was happy for Plaintiff and Ms. Lew getting promoted, and criticized
        Ms. Eisenberg for intentionally not disclosing any of the details of the changes to the
        Legal Team, so much so that the Legal Team members thought that the only change to the
        Legal Team's restructuring was to Plaintiff and Ms. Lew's title only.  This was an adverse
        employment action.  This was a hostile act.  Plaintiff suffered a hostile work
        environment, and Plaintiff believes Ms. Eisenberg targeted her again because of
        Plaintiff's race.

85.     Shortly after the December 2021 call with Ms. Eisenberg regarding her annual review,
        Plaintiff seriously considered taking leave under the Family Medical Leave Act due to
        stress from work.

86.     Plaintiff only postponed her decision to take FMLA leave because of the promotion and
        the hope that working conditions would improve under the new circumstances.  However,
        since the receipt of Mr. Murphy's email on February 17, 2022, Plaintiff continues to
        suffer extreme emotional distress in a very hostile work environment.

87.     Defendants devalued Plaintiff because of the color of her skin, national origin, sex,
        gender and religion, and retaliated against her because of her opposition.  The
        intersectionality of her race, sex and religion has exacerbated her experience at PA.  On

one hand, as a woman, Plaintiff is expected to be a warm and friendly co-worker who

does not challenge her male authorities, but on the other hand, she is sexualized when she

is kind to male co-workers beyond anything that is strictly business and even when she is

simply trying to do her work.  Yet when she creates boundaries in working with male

co-workers in a hostile, male-dominated environment, and treats them fairly but firmly,

she is accused of turning into "ice queen" and is criticized for being too "abrasive" or

"difficult to work with".  As an Asian woman, the stereotype and expectation to be a

submissive, docile and timid person become even more magnified.  As an Asian woman,

Plaintiff is easily mistrusted and viewed with suspicion.  All of these misconceptions are

false stereotypes that her hostile work environment exacerbated.  Not once has Mr.

Murphy, the Management Committee or any Managing Director taken Plaintiff's

concerns or complaints seriously, investigated, or asked for her opinion on anything of

substance outside the narrowly defined legal realm.  Plaintiff is not given an opportunity

to defend herself despite the history of her excellent performance for nearly 15 years.

But consistent with PA's prior treatment of her, especially in comparison to white men,

PA reneged on its own promises.  The abusive and discriminatory aspects of PA has made

Plaintiff feel like a shell of a person – gutted and discarded.

88.    Plaintiff was discriminated against in the terms, conditions and privileges of her

employment because of or substantially in part because of her race, gender and religion.

She reported and opposed the discrimination and sexual harassment on several occasions

and was retaliated against.  These unlawful acts were continuous, ongoing, and a pattern

and practice by Defendants for nearly 15 years.  In response to Plaintiff's reporting of,

opposition to, and filing her discrimination and other complaints against Defendants, she

has been singled out, blamed, and threatened by PA and the individual defendants.

IV.   **COUNT ONE (AGAINST ALL DEFENDANTS): RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

89.   Plaintiff hereby repeats and realleges paragraphs 1 to 88 as if fully pleaded herein.

90.   Plaintiff asserts her 42 U.S.C. § 1981 claim against the following Defendants: Portfolio

Advisors, LLC, Brian Murphy, Jesse Eisenberg, William Indelicato and Adam Clemens.

Defendants' conduct, by and through its agents, in treating Plaintiff in the manner

unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis

of her race in violation of 42 U.S.C. § 1981 in the terms, conditions and privileges of her

employment.

91.   Defendants in failing to adequately investigate and remedy the treatment to which

Plaintiff was subjected, despite the Defendants' knowledge of the conduct,

discriminatorily denied Plaintiff equal treatment on the basis of race in violation of 42

U.S.C. § 1981 in the terms, conditions and privileges of her employment.  Plaintiff was

intentionally subjected to a racially motivated hostile work environment that was

permeated with discriminatory intimidation, ridicule and insult.  The harassment Plaintiff

experienced was sufficiently severe and/or pervasive so as to adversely alter her working

conditions and cause her intentional emotional distress, physical sickness, depressed

feeling and physical harm.

92.   The discriminatory acts of Defendants as described above were intentional and were

substantially motivated on the basis of Plaintiff's race.  Defendants engaged in a pattern

and practice of intentional discrimination, which was Defendants' standard operating

procedure.  Defendants subjected Plaintiff to a hostile work environment.  Plaintiff's

workplace was permeated with discriminatory intimidation that was sufficiently severe and pervasive to alter the conditions of her work environment. There further exists a specific basis for imputing the conduct that created the hostile environment to the employer, as the adverse actions experienced by Plaintiff were caused solely by her supervisors and higher level managing director executives. All of the actions that occurred within this time period were part of one continuous ongoing hostile work environment perpetuated by Defendants because of Plaintiff's race, such that collectively the adverse employment actions constitute one continuous and unlawful employment practice.

93.    Defendants also retaliated against Plaintiff because she engaged in protected activity in violation of 42 U.S.C. 1981.

94.    Plaintiff at all times was qualified for her positions she held with Defendants.

95.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

96.    Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**V.    COUNT TWO (AGAINST PA): RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT, 42 U.S.C. § 2000e**

97.    Plaintiff hereby repeats and realleges paragraphs 1 to 96 as if fully pleaded herein.

98.    Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC. Defendant's conduct, by and through its agents, in treating Plaintiff in the manner unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of 42 U.S.C. § 2000e.

99.    Defendant in failing to adequately investigate and remedy the treatment to which Plaintiff

was subjected, despite the Defendant's knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of 42 U.S.C. § 2000e.  In addition, Plaintiff was subjected to a racially motivated hostile work environment that was permeated with discriminatory intimidation, ridicule and insult.  The harassment Plaintiff experienced was sufficiently severe and/or pervasive so as to adversely alter her working conditions and cause her intentional emotional distress.

100.    Plaintiff at all times was qualified for her positions she held with Defendant.

101.    Defendant engaged in a pattern and practice of intentional discrimination, which was Defendant's standard operating procedure.  Defendant subjected Plaintiff to a hostile work environment.  Plaintiff's workplace was permeated with discriminatory intimidation that was sufficiently severe and pervasive to alter the conditions of her work environment.  There further exists a specific basis for imputing the conduct that created the hostile environment to the employer, as the adverse actions experienced by Plaintiff were caused solely by her supervisors and higher level managing director executives.  All of the actions that occurred within this time period were part of one continuous ongoing hostile work environment perpetuated by Defendant because of Plaintiff's race, such that collectively the adverse employment actions constitute one continuous and unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1).

102.    The discriminatory acts of the Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

103.    On information and belief, Defendant exhibited a continuous pattern of race discrimination.  There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

104.   Plaintiff was treated differently than similarly situated non-Asian Americans.  Plaintiff
was discriminated against because of her race.

105.   As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past
and future economic, physical and emotional harm.

106.   Defendant should be held liable on this count and Plaintiff should be awarded all
appropriate relief.

## VI.   COUNT THREE (AGAINST PA): RACE DISCRIMINATION IN VIOLATION OF CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT, C.G.S.A. § 46a-60 et. seq.

107.   Plaintiff hereby repeats and realleges paragraphs 1 to 106 as if fully pleaded herein.

108.   Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.
Defendant's conduct, by and through its agents, in treating Plaintiff in the manner
unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis
of race in violation of Conn. Gen. Stat. § 46a-60 et.seq.

109.   Defendant in failing to adequately investigate and remedy the treatment to which Plaintiff
was subjected, despite Defendant's knowledge of the conduct, discriminatorily denied
Plaintiff equal treatment on the basis of race in violation of Conn. Gen. Stat. § 46a-60
et.seq.  In addition, Plaintiff was subjected to a racially hostile work environment that was
permeated with discriminatory intimidation, ridicule and insult.  The harassment Plaintiff
experienced was sufficiently severe and/or pervasive so as to adversely alter her working
conditions and cause her intentional emotional distress.

110.   Defendant engaged in a pattern and practice of intentional discrimination, which was
Defendant's standard operating procedure.  Defendant subjected Plaintiff to a hostile
work environment.  Plaintiff's workplace was permeated with discriminatory intimidation

that was sufficiently severe and pervasive to alter the conditions of her work environment.  There further exists a specific basis for imputing the conduct that created the hostile environment to the employer, as the adverse actions experienced by Plaintiff were caused solely by her supervisors and higher level managing director executives.  All of the actions that occurred within this time period were part of one continuous ongoing hostile work environment perpetuated by Defendant because of Plaintiff's race, such that collectively the adverse employment actions constitute one continuous and unlawful employment practice.

111.   The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

112.   As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

113.   Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**VII.   COUNT FOUR (AGAINST PA): GENDER DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000e**

114.   Plaintiff hereby repeats and realleges paragraphs 1 to 113 as if fully pleaded herein.

115.   Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC. Plaintiff was/is at all relevant times in question a highly qualified and respected employee of Defendant pursuant to Title VII of the Civil Rights Act.

116.   On information and belief, Defendant exhibited a continuous pattern of gender discrimination.  There were consistent and constant discriminatory acts by Defendant over a period of years.

117. Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of her gender, denial of equal pay, denial of Managing Director title, denial of an award of equity, and denial of timely promotion, all taken because of her gender.

118. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination.  Male employees were offered promotions and Plaintiff was not. Male employees were awarded comparably higher salaries and bonuses than Plaintiff. Male employees were supported in their professional decisions and Plaintiff's professional decisions were disregarded.  Male employees were allowed to make, and were supported in their, demeaning behaviors and negative comments towards women. Male employees were not disciplined for their unethical acts, whereas females were disciplined for less severe behaviors.  Male employees were not subjected to the hostile work environment that Plaintiff suffered based on her gender.

119. Plaintiff's gender was a substantial motivating factor for denial of her equal treatment in the terms, conditions and privileges of her employment.

120. On information and belief, Defendant exhibited a continuous pattern of gender discrimination.  There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

121. Plaintiff was treated differently than similarly situated male employees.  Plaintiff was discriminated against because she is female.

122. Defendant should be held liable for discriminating against Plaintiff because of her gender, in violation of Title VII of the Civil Rights Act.

**VIII.   COUNT FIVE (AGAINST PA):  GENDER DISCRIMINATION PURSUANT TO**

**CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT, C.G.S.A. § 46a-60 et.seq.**

123.   Plaintiff hereby repeats and realleges paragraphs 1 to 122 as if fully pleaded herein.

124.   Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

125.   Plaintiff was/is at all relevant times in question a highly qualified and respected employee of Defendant pursuant to CFEPA.

126.   On information and belief, Defendant exhibited a continuous pattern of gender discrimination.  There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

127.   Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of her gender, denial of equal pay, denial of Managing Director title, denial of an award of equity, and denial of timely promotion, all taken substantially in part because of her gender.

128.   Plaintiff was subjected to a hostile work environment that was permeated with discriminatory intimidation, ridicule and insult based on gender.  The harassment Plaintiff experienced was sufficiently severe and/or pervasive so as to adversely alter her working conditions and cause her intentional emotional distress.

129.   Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination.  Male employees were offered promotions and Plaintiff was not. Male employees were awarded comparably higher salaries and bonuses than Plaintiff. Male employees were supported in their professional decisions and Plaintiff's professional decisions were disregarded.  Male employees were allowed to make, and were supported in their, demeaning behaviors and negative comments towards women. Male employees were not disciplined for their unethical acts, whereas females were

disciplined for less severe behaviors.  Male employees were not subjected to the hostile

work environment that Plaintiff suffered based on her gender.

130.    Plaintiff's gender was a substantial motivating factor for denial of her equal treatment in

the terms, conditions and privileges of her employment.

131.    Plaintiff was treated differently than similarly situated male employees.  Plaintiff was

discriminated against substantially in part because she is female.

132.    Defendant should be held liable for discriminating against Plaintiff substantially in part

because of her gender, in violation of CFEPA.

## IX.    COUNT SIX (AGAINST PA): NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000e

133.    Plaintiff hereby repeats and realleges paragraphs 1 to 132 as if fully pleaded herein.

134.    Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

135.    Plaintiff was/is at all relevant times in question a highly qualified and respected employee

of Defendant pursuant to Title VII of the Civil Rights Act.

136.    On information and belief, Defendant exhibited a continuous pattern of national origin

discrimination.  There were consistent and constant discriminatory acts by Defendant

over a period of years.

137.    Plaintiff was subjected to a series of continuous adverse employment actions as described

herein, including but not limited to unequal treatment on account of her national origin,

denial of equal pay, denial of Managing Director title, denial of an award of equity, and

denial of timely promotion, all taken because of her national origin.

138.    Circumstances surrounding the adverse employment actions give rise to the inference of

national origin discrimination.  Non-Asian employees were offered promotions and

Plaintiff was not. Non-Asian employees were awarded comparably higher salaries and

bonuses than Plaintiff. Non-Asian employees were supported in their professional decisions and Plaintiff's professional decisions were disregarded.  Non-Asian employees were allowed to make, and were supported in their, targeted behaviors and negative comments towards Asian employees.  Non-Asian employees were not disciplined for their unethical acts, whereas Plaintiff was disciplined for less severe behaviors. Non-Asian employees were not subjected to the hostile work environment that Plaintiff suffered based on her national origin.

139.    Plaintiff was denied equal treatment in the terms, conditions and privileges of her employment because she is Asian.

140.    On information and belief, Defendant exhibited a continuous pattern of national origin discrimination.  There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

141.    Plaintiff was treated differently than similarly situated non-Asian employees.  Plaintiff was discriminated against because she is Asian.

142.    Defendant should be held liable for discriminating against Plaintiff because of her National origin, in violation of Title VII of the Civil Rights Act.

**X.     COUNT SEVEN (AGAINST PA):  NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT, C.G.S.A. § 46a-60 et.seq.**

143.    Plaintiff hereby repeats and realleges paragraphs 1 to 142 as if fully pleaded herein.

144.    Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

145.    Plaintiff was/is at all relevant times in question a highly qualified and respected employee of Defendant pursuant to Connecticut's Fair Employment Practices Act (CFEPA).

On information and belief, Defendant exhibited a continuous pattern of national origin discrimination.  There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

146.   Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of her national origin, denial of equal pay, denial of Managing Director title, denial of an award of equity, and denial of timely promotion, all taken substantially in part because of her national origin.

147.   Plaintiff was subjected to a hostile work environment that was permeated with discriminatory intimidation, ridicule and insult based on her national origin.   The harassment Plaintiff experienced was sufficiently severe and/or pervasive so as to adversely alter her working conditions and cause her intentional emotional distress.

148.   Circumstances surrounding the adverse employment actions give rise to the inference of national origin discrimination. Non-Asian employees were offered promotions and Plaintiff was not.  Non-Asian employees were awarded comparably higher salaries and bonuses than Plaintiff.  Non-Asian employees were supported in their professional decisions and Plaintiff's professional decisions were disregarded.  Non-Asian employees were allowed to make, and were supported in their, targeted behaviors and negative comments towards Asian employees.  Non-Asian employees were not disciplined for their unethical acts, whereas Plaintiff was disciplined for less severe behaviors.  Non-Asian employees were not subjected to the hostile work environment that Plaintiff suffered based on her national origin.

149.   Plaintiff's national origin was a substantial motivating factor for denial of her equal treatment in the terms, conditions and privileges of her employment.

150.    Plaintiff was treated differently than similarly situated non-Asian employees.  Plaintiff
        was discriminated against substantially in part because she is Asian.

151.    Defendant should be held liable for discriminating against Plaintiff substantially in part
        because of her gender, in violation of CFEPA.

**XI.    COUNT EIGHT (AGAINST PA): RELIGION DISCRIMINATION IN
        VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT, 42 U.S.C. § 2000e**

152.    Plaintiff hereby repeats and realleges paragraphs 1 to 151 as if fully pleaded herein.

153.    Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

154.    Plaintiff was/is at all relevant times in question a highly qualified and respected employee
        of the Defendant, pursuant to Title VII of the Civil Rights Act.

155.    Plaintiff is not a member of the Mormon church (The Church of Jesus Christ of Latter
        Day Saints).

156.    On information and belief, Defendant exhibited a continuous pattern of religious
        discrimination.  There were consistent and constant discriminatory acts by Defendant
        over a period of years.

157.    Plaintiff was subjected to a series of continuous adverse employment actions as described
        herein, including but not limited to unequal treatment on account of her religion, denial of
        equal pay, denial of Managing Director title, denial of an award of equity, and denial of
        timely promotion, all taken because of her religion.

158.    Circumstances surrounding the adverse employment actions give rise to the inference of
        religious discrimination. Non-Mormon employees were offered promotions and Plaintiff
        was not. Non-Mormon employees were awarded comparably higher salaries and bonuses
        than Plaintiff.  Non-Mormon employees were supported in their professional decisions
        and Plaintiff's professional decisions were disregarded.  Non-Mormon employees were

allowed to make, and were supported in their targeted behaviors and negative comments towards non-Mormon employees.  Non-Mormon employees were not disciplined for their unethical acts, whereas Plaintiff was disciplined for less severe behaviors.  Non-Mormon employees were not subjected to the hostile work environment that Plaintiff suffered based on her religion.

159.   Plaintiff was denied equal treatment in the terms, conditions and privileges of her employment because she is a non-Mormon.

160.   On information and belief, Defendant exhibited a continuous pattern of religious discrimination.  There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

161.   Plaintiff was treated differently than similarly situated Mormon employees.  Plaintiff was discriminated against because she is a non-Mormon.

162.   Defendant should be held liable for discriminating against Plaintiff because of her religion, in violation of Title VII of the Civil Rights Act.

## XII.   COUNT NINE (AGAINST PA):  RELIGION DISCRIMINATION IN VIOLATION OF CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT, C.G.S.A. § 46a-60 et.seq.

163.   Plaintiff hereby repeats and realleges paragraphs 1 to 162 as if fully pleaded herein.

164.   Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

165.   Plaintiff was/is at all relevant times in question a highly qualified and respected employee of the Defendant, pursuant to Connecticut's Fair Employment Practices Act (CFEPA).

166.   Plaintiff is not a member of the Mormon church (The Church of Jesus Christ of Latter Day Saints).

167.   On information and belief, Defendant exhibited a continuous pattern of religious discrimination.  There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

168.   Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of her religion, denial of equal pay, denial of Managing Director title, denial of an award of equity, and denial of timely promotion, all taken substantially in part because of her religion.

169.   Plaintiff was subjected to a hostile work environment that was permeated with discriminatory intimidation, ridicule and insult based on her being a non-Mormon.  The harassment Plaintiff experienced was sufficiently severe and/or pervasive so as to adversely alter her working conditions and cause her intentional emotional distress.

170.   Circumstances surrounding the adverse employment actions give rise to the inference of religious discrimination. Non-Mormon employees were offered promotions and Plaintiff was not.  Non-Mormon employees were awarded comparably higher salaries and bonuses than Plaintiff.  Non-Mormon employees were supported in their professional decisions and Plaintiff's professional decisions were disregarded.  Non-Mormon employees were allowed to make, and were supported in their, targeted behaviors and negative comments towards non-Mormon employees.  Non-Mormon employees were not disciplined for their unethical acts, whereas Plaintiff was disciplined for less severe behaviors.  Non-Mormon employees were not subjected to the hostile work environment that Plaintiff suffered based on her religion.

171.   Plaintiff's religion was a substantial motivating factor for denial of her equal treatment in the terms, conditions and privileges of her employment.

172. Plaintiff was treated differently than similarly situated Mormon employees.  Plaintiff was discriminated against substantially in part because she is a non-Mormon.

173. Defendant should be held liable for discriminating against Plaintiff substantially in part because of her religion, in violation of CFEPA.

## XIII.   COUNT TEN (AGAINST PA):  VIOLATION OF EQUAL PAY ACT, 29 U.S.C.A. §206(d)(1)

174. Plaintiff hereby repeats and realleges paragraphs 1 to 173 as if fully pleaded herein.

175. Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

176. Defendant pays different wages to female employees, including Plaintiff, than it does to its male employees when employees perform equal work on jobs requiring equal skill, effort and responsibility; and the jobs are performed under similar working conditions.

177. Plaintiff was paid less than her male co-workers.  Plaintiff was paid comparably less than her male co-workers when she had more experience, more responsibility and a greater recorded work performance than these male employees.

178. Plaintiff was discriminated against and paid only a percentage of her income and bonus because she was female.

179. Defendant should be held liable on this claim.

## XIV.   COUNT ELEVEN (AGAINST PA): INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

180. Plaintiff hereby repeats and realleges paragraphs 1 to 179 as if fully pleaded herein.

181. Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

182. The unlawful employment actions alleged herein were the direct result of Defendant's actions to intentionally inflict emotional distress, and Defendant knew or should have known that such distress was a likely result of their conduct.

183.    Defendant knew of Plaintiff's ongoing medical conditions because she reported them to her employer.

184.    Plaintiff's allegations of employment discrimination caused by Defendant were as extreme and outrageous as to offend the common decency of any similarly situated individual in her position.  No employee should be subjected to direct race, religion and national origin discrimination, hostile work environment and racially-targeted teasing of the type alleged herein.

185.    Defendant possessed knowledge that the employment discrimination alleged herein directly violated Defendant's own employment policies, but did nothing to remedy each and every violation.

186.    Plaintiff has experienced severe emotional, psychological and physical injuries as a direct and proximate cause of Defendant's actions.

187.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

188.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XV.    COUNT TWELVE (AGAINST PA):  VIOLATION OF CONNECTICUT PAY EQUITY ACT, CONN. GEN. STAT. 31-75 et seq.

189.    Based on the foregoing, Defendant PA deprived Plaintiff of equal pay in violation of Conn. Gen. Stat. 31-75 & 31-76.

190.    Plaintiff asserts her claim against the following Defendant: Portfolio Advisors, LLC.

191.    Defendant pays different wages to female employees, including Plaintiff, than it does to its male employees when employees perform equal work on jobs requiring equal

skill, effort and responsibility; and the jobs are performed under similar working conditions.

192. Plaintiff was paid less than her male co-workers. Plaintiff was paid comparably less than her male co-workers when she had more experience, more responsibility and a greater recorded work performance than these male employees.

193. Plaintiff was discriminated against and paid only a percentage of her income and bonus because she was female.

194. Defendant PA acted intentionally or with reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

195. Defendant should be held liable on this claim.

## XVI.   COUNT THIRTEEN (AGAINST PA): RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

196. Based on the foregoing, Defendant PA retaliated against Plaintiff because she opposed discrimination in violation of Title VII of the Civil Rights Act of 1964.

197. Plaintiff engaged in protected activity by opposing discriminatory employment practices.

198. Defendant PA had knowledge of Plaintiff's protected activity.

199. Defendant PA subjected Plaintiff to adverse actions because of her protected activity.

200. Defendant PA's retaliatory actions have caused Plaintiff to suffer compensatory and economic damages.

201. Defendant PA acted with reckless disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

## XVII.  COUNT FOURTEEN (AGAINST PA): RETALIATION IN VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT

202.  Based on the foregoing, Defendant PA retaliated against Plaintiff because she opposed discrimination in violation of the Connecticut Fair Employment Practices Act.

203.  Plaintiff engaged in protected activity by opposing discriminatory employment practices.

204.  Defendant PA had knowledge of Plaintiff's protected activity.

205.  Defendant PA subjected Plaintiff to adverse actions because of her protected activity.

206.  Defendant PA's retaliatory actions have caused Plaintiff to suffer compensatory and economic damages.

207.  Defendant PA acted with reckless disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages.

## XVIII.       PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

A.  Declare discrimination and award of compensatory damages for race discrimination in violation Title VII, 42 U.S.C. §1981 and CFEPA, in an amount to be determined at trial;

B.  Declare discrimination and award of compensatory damages for race, religion, gender and national origin discrimination and retaliation in violation of Title VII, 42 U.S.C. §1981 and CFEPA, in an amount to be determined at trial;

C.  Declare discrimination and award compensatory damages for violating the Equal Pay Act;

D.  Declare retaliation and award compensatory damages for violating Title VII and CFEPA, in an amount to be determined at trial;

E.   Declare that Defendants intentionally and willfully caused Plaintiff emotional

distress and award damages in an amount to be determined at trial;

F.   Award punitive and liquidated damages to Plaintiff;

G.   Award attorney's fees and costs;

H. Award interest and costs;

I.   Award such other relief in law or equity as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by her Complaint.

PLAINTIFF,
MICHELLE LEE

/s/ Todd Steigman

By: Charles H. Jung
(*pro hac vice forthcoming*)
Nassiri & Jung LLP
1700 Montgomery Street, Suite 207\
Phone: (415) 762-3100
Fax: (415) 534-3200
E-mail: charles@njfirm.com
*Lead Counsel for Plaintiff*

William G. Madsen (ct09853)
Todd Steigman (ct26875)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Phone: (860) 246-2466
Fax: (860) 246-1794
E-mail: wmadsen@mppjustice.com
E-mail: tsteigman@mppjustice.com
*Local Counsel for Plaintiff*

# EXHIBIT A

## LEADERSHIP

FUNCTION

STRATEGY

TITLE

LOCATION

## MANAGEMENT COMMITTEE

GROUP HEADS



(https://www.portad.com/person
brian/)
**Brian Murphy**
Managing Director



(https://www.portad.com/person
adam/)
Adam Clemens
Managing Director



(https://www.portad.com/person
scott/)
**Scott Higbee**
Managing Director



(https://www.portad.com/person
william/)
William Indelicato
Managing Director

 

(https://www.portad.com/person    (https://www.portad.com/person

brooks-a/)    stephen/)

**Brooks Lindberg**    **Stephen Sloan**
Managing Director    Managing Director

# EXHIBIT B

LEADERSHIP

FUNCTION

STRATEGY

TITLE

LOCATION

MANAGEMENT COMMITTEE

GROUP HEADS



(https://www.portad.com/person
brian/)

**Brian Murphy**
Managing Director



(https://www.portad.com/person
adam/)

Adam Clemens
Managing Director



(https://www.portad.com/person
scott/)

**Scott Higbee**
Managing Director



(https://www.portad.com/person
william/)

William Indelicato
Managing Director



(https://www.portad.com/person

brooks-a/)

**Brooks Lindberg**
Managing Director



(https://www.portad.com/person

stephen/)

**Stephen Sloan**
Managing Director



(https://www.portad.com/person

kenneth/)

**Kenneth Binick**
Managing Director



(https://www.portad.com/person

liz/)

**Liz Campbell**
Managing Director



(https://www.portad.com/person
sfetcu-dan/)

**Dan Cohn-Sfetcu**
Managing Director



(https://www.portad.com/person
igor/)

Igor DaCosta
Managing Director



(https://www.portad.com/person
chris/)

**Chris Genovese**
Managing Director



(https://www.portad.com/person
jonathan/)

Jonathan English
Managing Director



(https://www.portad.com/person
greg/)
Greg Garrett
Managing Director



(https://www.portad.com/person
charles/)
Charles Harper
Managing Director



(https://www.portad.com/person
briac/)
Briac Houtteville
Managing Director



(https://www.portad.com/person
john/)
John Kyles
Managing Director



(https://www.portad.com/person

jesse/)

**Jesse Eisenberg**
General Counsel and Managing
Director



(https://www.portad.com/person

jason/)

**Jason Landon**
Managing Director



(https://www.portad.com/person

dirk/)

**Dirk Lienemann, CFA**
Managing Director



(https://www.portad.com/person

brian/)

**Brian Mooney**
Managing Director



(https://www.portad.com/person hugh/)

Hugh Perloff
Managing Director



(https://www.portad.com/person der-schulenburg-nicolas/)

Nicolas v.d. Schulenburg
Managing Director



(https://www.portad.com/person brian/)

Brian Schwartz
Managing Director



(https://www.portad.com/person kenneth/)

Kenneth Wisdom
Managing Director



(https://www.portad.com/person dan/)

Dan Dwyer
Chief Compliance Officer & Counsel



(https://www.portad.com/person lauren/)

Lauren Johnson
Chief Financial Officer - Corporate



(https://www.portad.com/person daniel/)

Daniel Iamiceli
Chief Financial Officer



(https://www.portad.com/person mark/)

Mark Perry
Chief Information Officer



(https://www.portad.com/person
steve/)

**Steve Scolnik**
Chief Technology Officer

# EXHIBIT C

LEADERSHIP

FUNCTION

STRATEGY

TITLE

LOCATION

MANAGEMENT COMMITTEE

GROUP HEADS



(https://www.portad.com/person

brian/)

**Brian Murphy**
Managing Director



(https://www.portad.com/person

scott/)

Scott Higbee
Managing Director



(https://www.portad.com/person

brooks-a/)

Brooks Lindberg
Managing Director



(https://www.portad.com/person

stephen/)

Stephen Sloan
Managing Director



(https://www.portad.com/person

kenneth/)

**Kenneth Binick**
Managing Director



(https://www.portad.com/person

liz/)

Liz Campbell
Managing Director



(https://www.portad.com/person

sfetcu-dan/)

**Dan Cohn-Sfetcu**
Managing Director



(https://www.portad.com/person

igor/)

Igor DaCosta
Managing Director



(https://www.portad.com/person
chris/)

**Chris Genovese**
Managing Director



(https://www.portad.com/person
jonathan/)

**Jonathan English**
Managing Director



(https://www.portad.com/person
greg/)

**Greg Garrett**
Managing Director



(https://www.portad.com/person
patrick/)

**Patrick Gerbracht**
Managing Director



(https://www.portad.com/person

charles/)

**Charles Harper**
Managing Director



(https://www.portad.com/person

john/)

**John Kyles**
Managing Director



(https://www.portad.com/person

jesse/)

**Jesse Eisenberg**
General Counsel and Managing
Director



(https://www.portad.com/person

jason/)

**Jason Landon**
Managing Director



(https://www.portad.com/person
dirk/)

**Dirk Lienemann, CFA**
Managing Director



(https://www.portad.com/person
justin/)

Justin Lux
Managing Director



(https://www.portad.com/person
brian/)

**Brian Mooney**
Managing Director



(https://www.portad.com/person
hugh/)

Hugh Perloff
Managing Director





(https://www.portad.com/person
der-schulenburg-nicolas/)

**Nicolas v.d. Schulenburg**
Managing Director

(https://www.portad.com/person
kenneth/)

**Kenneth Wisdom**
Managing Director

# EXHIBIT D

LEADERSHIP

FUNCTION

STRATEGY

TITLE

LOCATION

MANAGING DIRECTOR



(https://www.portad.com/person
dan/)

Dan Dwyer
Chief Compliance Officer &
Counsel



(https://www.portad.com/person
lauren/)

Lauren Johnson
Chief Financial Officer - Corporate



(https://www.portad.com/person
daniel/)

Daniel Iamiceli
Chief Financial Officer



(https://www.portad.com/person
mark/)

Mark Perry
Chief Information Officer



(https://www.portad.com/person
steve/)

**Steve Scolnik**
Chief Technology Officer