## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MICHELLE LEE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIV. ACTION NO.** |
| **v.** | : | **3:22-cv-00819 (SVN)** |
| | : | |
| | : | |
| **PORTFOLIO ADVISORS, LLC,** | : | |
| **BRIAN MURPHY, JESSE EISENBERG,** | : | |
| **WILLIAM INDELICATO, and ADAM** | : | **JURY TRIAL DEMANDED** |
| **CLEMENS,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | **SEPTEMBER 23, 2022** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' RULE 12(f) MOTION TO STRIKE AND RULE 12(b)(6) MOTION TO DISMISS

## I.    INTRODUCTION

Throughout the fifteen years that Plaintiff Michelle Lee worked for Defendant Portfolio Advisors, LLC ("PA"), she experienced numerous instances of harassment and discrimination. As a result, the First Amended Complaint necessarily is lengthy. Evidence of past acts, including those outside the statute of limitations period, are admissible in federal courts under binding United States Supreme Court and Second Circuit precedent, because they provide evidence of the corporate culture, of knowledge, and of discriminatory intent. Defendants ignore the applicable law, and the Rule 12 motions must be denied.

Defendants' wrongful intent of discrimination and the ongoing and continuous pattern of Defendants' wrongdoing are evidenced by their past acts and their treatment of other PA employees. Plaintiff Michelle Lee was subjected to unlawful discrimination based on her race, national origin, sex and religion, given unequal pay and subjected to hostile work environment and retaliation. Courts have consistently held that allegations concerning conduct that took place during the time-barred period can be considered as background evidence, and as evidence of intent and knowledge, in evaluating the merits of a discrimination case with respect to the timely alleged act. Therefore, such allegations are material and pertinent to Plaintiff's timely filed claims. Courts similarly have consistently permitted evidence of defendants' discriminatory behavior against other employees as relevant and admissible to demonstrate corporate culture, discriminatory intent, and pretext for discriminatory and retaliatory acts. Accordingly Defendants' Rule 12(f) and Rule 12(b)(6) motions lack merit.

Defendants can't have their cake and eat it too. Defendants insisted that Plaintiff's original complaint ("Original Complaint") was too lengthy and detailed, and must be truncated, which Plaintiff accommodated in good faith, filing the operative First Amended Complaint ("FAC").

Defendants now seek dismissal arguing that the FAC lacks sufficient details. If the FAC still is lengthy, it's because of the sheer weight of Defendants' bad behavior. Plaintiff's FAC retains sufficient factual details to state her claims.

Defendants improperly bisect Plaintiff's sex discrimination claim into allegations of pregnancy discrimination and sexual harrassment to argue the absence of timely acts of those types of discrimination. However, the FAC does not allege separate claims for pregnancy discrimination or sexual harassment, but rather includes these background facts in support of the sex discrimination claim connected to timely adverse actions and to show discriminatory intent based on sex that is relevant to Plaintiff's timely claims.

Plaintiff has stated her claim under Conn. Gen. Stat. §31-51q by filing a lawsuit with a broader public purpose of opposing illegal discrimination in the workplace, which is First Amendment protected speech subject to the statute, and for which Defendants retaliated against Plaintiff by, among other things, terminating Plaintiff.

## II.    FACTUAL BACKGROUND

Plaintiff is an Asian American of South Korean national origin. Compl. ¶13. Plaintiff graduated from Yale University in 2001 and Yale Law School in 2005 with distinction and honor and worked at Latham & Watkins for two years prior to joining PA. *Id.* Plaintiff worked at PA from November 2007 until June 28, 2022 when PA terminated her the day after this lawsuit was filed. *Id*. Plaintiff contributed significantly to PA by managing the majority of investments of PA's sponsored funds and clients which generated hundreds of millions of dollars in profit for PA and Defendants. *Id*. ¶18. For nearly 15 years, Plaintiff worked at all hours, including weekends, vacations and holidays, and consistently received excellent performance reviews. *Id*. ¶20.

On March 23, 2022, Plaintiff filed a charge with the EEOC and CHRO for discrimination based on race, national origin, sex and religion. *Id*. ¶10. Plaintiff filed her Original Complaint on June 27. Dkt. No. 1.[1] *Id*. ¶¶13, 63. The next day, PA terminated her. *Id*. ¶¶13, 64. Plaintiff filed her FAC on August 3. Dkt. No. 28.

## III.    LEGAL PRINCIPLES APPLICABLE TO RULE 12 MOTIONS

## A.    MOTIONS TO STRIKE ARE DISFAVORED (RULE 12(f))

"Motions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." *Ruffino* v. *Murphy*, No. 3:09-CV-1287 (VLB), 2009 WL 5064452, at *1 (D. Conn. Dec. 16, 2009), citing *Schramm* v. *Kirschell*, 84 F.R.D. 294, 299 (D. Conn. 1979) (internal quotations omitted). The Second Circuit has consistently held that allegations regarding conduct during time-barred period is admissible as background evidence in evaluating the merits of timely filed discrimination claims. *Davidson* v. *LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013). "[A]ny adverse acts that occurred prior to [the statute of limitations period] may be considered . . . as background evidence to support any non-timebarred acts of discrimination or retaliation." *Johnson* v. *Conn. Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech*., No. 17-CV-00901, 2018 WL 306697, at *4 (D. Conn. Jan. 5, 2018).

Defendants mis-cite *Ruffino*, 2009 U.S. Dist. LEXIS 117357 and *Mahon* v. *Chicago Title Ins. Co.*, No. 3:09-cv-690(AWT), 2009 WL 4268372 (D. Conn. Nov. 24, 2009). *Ruffino* is inapposite, as the Court granted the motion to strike against certain defendants only because the Court had already dismissed all claims against such defendants. *Mahon* is also inapposite because the Court only struck introductory allegations that addressed irrelevant public policy aspects of the insurance industry. *Mahon*, 2009 WL 4268372, at *1. Plaintiff's claims involve PA employees, including Defendants who committed hostile and discriminatory acts or witnessed such acts against Plaintiff and other PA

---

[1]  The Court is requested to take judicial notice of its files.

employees. Defendants' reference to and reliance on *Ruffino* and *Mahon* in support of their motion to strike are misplaced and improper.

## B.     APPLICABLE STANDARDS

A "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . [F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678  (2009). "At the Rule 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. . .  [The court's] task in reviewing a 12(b)(6) ruling "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." " *Sims* v. *Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) (citation omitted). Plaintiff's allegations concerning what occurred during time-barred period are admissible for the purposes of demonstrating background, corporate culture, discriminatory intent, pretext, liability and knowledge, and are thus material and pertinent, and each of Plaintiff's Counts states a claim upon which relief can be granted. *See supra* Section III (A) and *infra* Section IV (B).

## IV.    DISCUSSION

## A.    THE FAC COMPLIES WITH FED. R. CIV. P. 8, AND DEFENDANTS' MOTION TO STRIKE BASED ON THIS RULE LACKS MERIT

Defendants' motion to strike based on Rule 8 must be denied because it fails to satisfy the standard set forth in *Shankar*, which requires that the motion "must state with particularity the grounds for seeking the order." Fed. R. Civ. P. 7(b)(1).[2] Except with respect to "the first five sentences

---

[2] *Ssee, e.g., Perma Research & Dev. Co.* v. *Singer Co.*, 410 F.2d 572, 579 (2d Cir. 1969) ("[T]he motion to strike was much too general in that it did not specify which parts of the . .. affidavit should be stricken and why . . . . [T]he motion to strike must be precise.")." *Shankar*, 2021 WL 3542803, at *10-11.

of the Complaint," Defendants merely make a vague, general blanket statement that "[t]he allegations in the Complaint that fail to comply with Rule 8 are irrelevant and immaterial, and should be stricken accordingly," without any reference to specific sections of the FAC that should be stricken for violating Rule 8. Defs.' Mem. 15.

In *Green* v. *City of Mount Vernon*, 96 F. Supp. 3d 263, 280-81 (S.D.N.Y. 2015), the court addressed the question of "how long is not short enough?" when it denied the defendants' motion to dismiss based on the argument made here by Defendants, that the plaintiff's complaint violated Rule 8 because it was too lengthy. The court reasoned that

> "[t]he fundamental command of the Federal Rules of Civil Procedure is never to exalt form over substance." When enforcing technical requirements on litigants, courts are always mindful of the "jurisprudential preference for adjudication of cases on their merits rather than on the basis of formalities." Instead of focusing on whether a complaint's allegations are "short and plain" or "simple, concise, and direct," the Court asks whether the complaint gives "fair notice" to the defendants.  [Citations omitted.]

Plaintiff experienced a course of conduct for nearly 15 years, and she pled revelant, admissible facts with respect to prior acts and a continuous and ongoing pattern of discrimination based on race, national origin, sex, religion, unequal pay and retaliation. The FAC's length is reasonable in light of the duration and scope of the discriminatory and illegal acts committed. The allegations are appropriate also as background evidence. Each separate allegation has been stated concisely and plainly.

The Court in *Green* further found that defendants' fair notice enabling them to answer and prepare for trial was evident from the fact that they brought a motion to dismiss under Rule 12(b)(6) in which they identified and responded to plaintiffs' claims. *Green*, 96 F. Supp. 3d at 281. Here, Defendants have also brought a motion to dismiss under Rule 12(b)(6) in which they identified and responded to each claim raised by Plaintiff, making it evident that Defendants received fair notice which enabled them to answer and prepare for trial.

5

**B.    RELATED TIME-BARRED ALLEGATIONS ARE ADMISSIBLE AS BACKGROUND EVIDENCE**

Allegations in the FAC that are outside the statutes of limitations are admissible to show background, corporate culture, discriminatory intent and pretext. The Second Circuit courts have consistently held that allegations regarding conduct during time-barred period may be admissible as background evidence in evaluating the merits of timely filed discrimination claims. *Davidson*, 523 F. App'x at 839. In *Rodriguez* v. *City of Danbury*, 2019 WL 4806032, at *10 (D. Conn. Sept. 30, 2019), this Court stated, "an employee may "us[e] the prior acts as background evidence in support of a timely claim." *Id. Rodriguez* cites *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101 (2002), which Defendants quote from and rely on extensively in Defs.' Mem. to incorrectly conflate evidence that is *actionable* versus evidence that is *admissible*, as described *infra* Sections IV (F) and (G). In *Johnson*, 2018 WL 306697, at *4, this Court also reiterated that "any adverse acts that occurred prior to [the statute of limitations period] may be considered . . . as background evidence to support any non-timebarred acts of discrimination or retaliation," and again in *Marzano* v. *S. New England Tel. Co.*, No. 16-CV-1274, 2018 WL 4341149, at *2 (D. Conn. Sept. 10, 2018), this Court confirmed that "[o]f course, evidence of prior events may be considered for background purposes to the extent that they may shed light on the significance of events occurring within the statute of limitations period."

Other Second Circuit courts have ruled similarly on the issue of admissibility of time-barred allegations as background evidence to assess liability of timely claims. *See Chin* v. *Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012) (affirming that background evidence from outside the limitations period "may be considered to assess liability on the timely alleged act" (quoting *Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005)); *Vives* v. *New York City Dep't of Corr.*, No. 15-CV-06127, 2019 WL 1386738, at *18-20 (E.D.N.Y. Mar. 27, 2019) (permitting the admissibility of plaintiff's claims arising out of conduct that took place during the time-barred period

and ruled that such claims would "be considered as background evidence to assess liability on the timely alleged facts"); *Ruiz* v. *New Avon LLC*, No. 18 Civ. 9033, 2019 WL 4601847, at \*50 (S.D.N.Y. Sept. 22, 2019) (denying defendant's motion to strike relevant complaints because "evidence of past discriminatory practices of an employer is generally relevant in employment discrimination claims.") (citation omitted).

In arguing that time-barred allegations should be stricken under Rule 12(f), Defendants conflate evidence that is *actionable* with what can be *alleged*, and misrepresent the case law. For example, Defendants argue that "Plaintiff is only permitted to *allege* facts dating back 300 days" (emphasis added), and then quote from *Morgan* which states that "[o]nly those acts occurring within 300 days of the date that employee filed his charge with Equal Employment Opportunity Commission (EEOC) were *actionable* under Title VII…") (emphasis added). Defs.' Mem. 22. Defendants similarly distort the Court's position on the admissibility of evidence of time-barred claims in *Birch* v. *City of New York*, 675 F. App'x 43, 44 (2d Cir. 2017), quoting *Morgan*, claiming that "[d]iscrete discriminatory acts are not *actionable* if time barred, even when they are related to acts alleged in timely filed charges." (*Morgan,* 536 U.S. at 113) (emphasis added). Conduct outside the statute of limitations may be "alleged" for various purposes, including as background evidence, or to prove liability, discriminatory intent, pretext or knowledge, even if such allegations are not "actionable". Contrary to Defendants' contention, the Court clearly articulated in *Morgan* that the statute of limitation does not "bar an employee from using the prior acts as background evidence to support a timely claim." *Id.*, 536 U.S. at 102.

Contrary to Defendants' argument that time-barred allegations "do nothing more than prejudice the Defendants," Defs.' Mem. 17, courts have recognized that the probative value of evidence of other discriminatory acts by an employer is high because it goes to the element of intent,

which is rarely subject to direct proof. *See Heyne* v. *Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995); *Jones* v. *Washington Metropolitan Area Transit Authority*, 946 F. Supp. 1011, 1019 (D.D.C. 1996) (evidence of prior discriminatory acts probative of intent and not prejudicial); *Hurley* v. *Atlantic City Police Department*, 933 F. Supp. 396, 411-13 (D.N.J.1996) (evidence of prior acts of harassment admitted). In light of the Second Circuit's strong disfavor of motions to strike and clear precedents permitting admission of allegations of conduct that occurred during time-barred periods as background evidence of discrimination based on timely allegations, Defendants' motion to strike or dismiss should be denied.

Moreover, there is no time bar for Plaintiff's hostile work environment claims, since Defendants' acts are part of the same unlawful employment practice of discrimination, with many acts falling within the statute of limitations period. *See Ruiz*, 2019 WL 4601847, at *43 ("hostile work environment claims are different in kind from discrete acts" as "[t]heir very nature involves repeated conduct." citing *Morgan*, 536 U.S. at 115.) *Morgan* stated that, "a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [statute of limitations] period." *Id*. at 122. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*. at 117. Defendants engaged in an ongoing and continuous pattern of intentional discrimination. Conduct during all of Plaintiff's tenure at PA was part of one continuous ongoing hostile work environment perpetuated by Defendants because of Plaintiff's race, national origin, sex and religion.

For example, Plaintiff has alleged multiple relevant acts of Eisenberg that fell within the 300-day period, including, but not limited to, Eisenberg's attempt to undermine and discredit Plaintiff

during her review process and promotions throughout 2021 and early 2022. The continuous and ongoing pattern of Eisenberg's behavior and the Management Committee's intentional inaction that spanned the entire time period of their occurrences should be considered by the Court for the purpose of determining liability based on a hostile work environment.[3]

Because time-barred allegations are admissible for the purposes of demonstrating background, corporate culture, discriminatory intent, pretext, liability and knowledge and are thus material and pertinent.  As a result, there is no merit to Defendants' request to strike the FAC's allegations of misconduct outside the applicable statute of limitations period (*see* Defs.' Mem. 2, 6-9, 11-12, 15-18, 22-23, 28-32 and 34-35).

## C.   EVIDENCE OF DISCRIMINATORY TREATMENT AGAINST OTHERS IS ADMISSIBLE

Plaintiff's allegations of discriminatory actions by Defendants against other PA employees reveal patterns of discrimination and increase the likelihood that PA's proffered explanation for an employment decision regarding Plaintiff masks a discriminatory motive. These allegations are relevant to significant issues in the case, including discriminatory and retaliatory intent and pretext.

Courts have consistently held that evidence regarding discrimination or retaliation against other employees by the defendant is relevant to the issue of the employer's intent. "[I]t is well established in the Second Circuit that one way to establish retaliation is to demonstrate that other people who have participated in protected activity have been treated adversely and similarly to plaintiffs." *Gaffney* v. *Dep't of Info. Tech.*, 579 F. Supp. 2d 455, 460 (S.D.N.Y. 2008), citing *Saulpaugh* v. *Monroe Cmty. Hosp.*, 4 F.3d 134, 141 (2d Cir. 1993); *Taitt* v. *Chemical Bank*, 849 F.2d 775, 778 (2d Cir. 1988); and *DeCintio* v. *Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.

---

[3] Defendants falsely accuse Plaintiff and her counsel of attempting to "obfuscate" and to commit "subterfuge," and have threatened a meritless Rule 11 sanctions motion. Defendants ignore the well established rule that allegations of conduct during the time-barred period are admissible for the purposes of demonstrating background, corporate culture, discriminatory intent, pretext, liability and knowledge, and are thus material and pertinent.

1987).[4] As the D.C. Circuit explained in a case in which it reversed the district court's decision to exclude testimony from other employees regarding retaliation, "evidence showing that the employer followed a broad practice of retaliation and responded to any protected criticism with disciplinary action has some probative value on the issue of the employer's likely motivation here." *Morris* v. *Washington Metropolitan Area Transit Auth.*, 702 F.2d 1037, 1046 (D.C. Cir. 1983).

Courts also have recognized that "evidence of a defendant's prior discriminatory treatment of a plaintiff *or other employees* is relevant and admissible . . . to establish whether a defendant's employment action against an employee was motivated by invidious discrimination." *Becker* v. *ARCO Chem. Co.*, 207 F.3d 176, 194 (3d Cir. 2000) (emphasis added). *See also Scott* v. *WPIX, Inc.*, 2012 WL 2026428, at 3 *1-3 (S.D.N.Y. May 17, 2012) (holding that evidence of other acts of discrimination similar to those alleged by plaintiff was relevant to the plaintiff's claims and that the danger of prejudice to defendant did not outweigh the probative value of such evidence given that such evidence was probative of the motive of the common decision-maker); *Phillip* v. *ANR Freight Sys., Inc.*, 945 F.2d 1054 (8th Cir.1991) (stating that "background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive") (internal quotation omitted).

As the Supreme Court held in *Sprint/United Management Company* v. *Mendelsohn*, 552 U.S. 379 (2008), it would have been an abuse of discretion for a trial court to adopt a blanket *per se* rule declaring that evidence regarding discriminatory actions against other employees by managers who were not involved in the alleged discrimination against the plaintiff was inadmissible, because such

---

[4] *See also Spula*k v. *K-Mart Corp*., 894 F.2d 1150, 1156 (10th Cir. 1990); *Philip* v. *ANR Freight Systems, Inc*., 945 F.2d 1054, 1056-57 (8th Cir. 1991); *Zubulake* v. *UBS Warburg LLC*, 382 F. Supp. 2d 536, 544-46 (S.D.N.Y. 2005); *Ri Sau Kuen Chan* v. *NYU Downtown Hosp*., 2004 WL 1886009 **4-6 (S.D.N.Y. Aug. 23, 2004); *Worthington* v. *County of Suffolk*, No. 02-cv-723, 2007 WL 2115038 *4 (E.D.N.Y. July 20, 2007); *Hunter* v. *Allis-Chalmers Co*rp., 797 F.2d 1417, 1423-24 (7th Cir. 1986); *EEOC* v. *Farmer Bros. Co*., 31 F.3d 891, 897-98 (9th Cir. 1994); *DeMarco* v. *W. Hills Montessori*, 350 F. App'x 592, 594 (2d Cir. 2009) (plaintiff was entitled to introduce testimony from other employees about harassment in the workplace); *Howley* v. *Town of Stratford*, 217 F.3d 141, 155 (2d Cir.2000); *Perry* v. *Ethan Allen, Inc*., 115 F.3d 143, 150-51 (2d Cir.1997).

evidence can be relevant and admissible depending on the particular facts and circumstances of the case, even when it involves a supervisor who was not involved in the alleged discrimination against the plaintiff. *Id.* at 387. In this case, the evidence regarding other acts of discrimination or retaliation implicates many of the same supervisors who were involved in the discrimination and retaliation against Plaintiff. Evidence concerning "alleged retaliation by the same individual who allegedly retaliated against Plaintiff . . . with respect to the same protected activity . . . during the same time period" is both relevant and admissible. *Mugavero* v. *Arms Acres, Inc*., 2009 U.S. Dist. LEXIS 56214, at *22-23 (S.D.N.Y. July 1, 2009); *Zubalake* v. *UBS Warburg, LLC*, 382 F.Supp.2d 536, 544 (S.D.N.Y. 2005).[5]

"The Court may also consider as circumstantial evidence the atmosphere in which the company made its employment decisions." *Josey* v. *John Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir. 1993). "Corporate discrimination does not occur in a vacuum. Discrimination feeds on the actions and statements of those involved in the corporate culture." *Hamlin* v. *Alliant Techsystems, Inc*., 636 N.W. 2d 150, 154 (Minn. Ct. App. 2001). *See also Slattery* v. *Swiss Reinsurance America Corp.*, 248 F.3d 87 (2d Cir. 2001) (holding that evidence of corporate culture is relevant to a circumstantial case of discrimination).

Consistent with these cases, Plaintiff should be permitted to allege in the FAC, and offer evidence, that Defendants discriminated against other Asian employees, female employees, non-Mormon employees and non-Korean employees, including, but not limited to, Ms. K and Mr. N, Asian American employees who were racially discriminated against by Defendants; other female employees who were sexually harassed or were discriminated against based on sex; and Mr. H and O who were pressured to hire Mormon candidates who did not have the requisite experience for the

---

[5] *See also Rifkinson* v. *CBS, Inc*., No. 94 Civ. 07985(JCF), 1997 WL 634514, at *2 (S.D.N.Y. Oct. 14, 1995); *Jute* v. *Hamilton Sundstrand Cor*p., 420 F.3d 166, 178 (2d Cir. 2005); *Goldsmith* v. *Bagby Elevator Co*., 513 F.3d 1261, 1286 (11th Cir. 2008).

position, all of whom, like Plaintiff experienced discrimination which Plaintiff has claimed. Similar to Plaintiff, Ms. K, an Asian American woman, was underpromoted, underpaid, treated with suspicion with respect to expenses, given undesirable assignments and criticized for being difficult to work with. Mr. N, an Asian American man, was discriminated against because of his national origin and race, not invited to participate or present because of his accent, and criticized for "not presenting well" without other substantive reasons when further probed about such comments. Other unnamed female employees who were sexually harassed or discriminated against based on sex were also subject to lower pay and promotion compared to their white, male comparators. Mr. H and O's direct comments to Plaintiff about getting pressure to hire Mormons who were not qualified for the positions speak to the discriminatory intent of Defendants with respect to Plaintiff's claim of religious discrimination, as Plaintiff is not Mormon and was not provided the same level of promotions, compensation and opportunities as Mormon men received at PA.

The Court should allow Plaintiff to present evidence regarding such discriminatory actions by Defendants against other PA employees because it is relevant to significant issues in the case, including discriminatory and retaliatory intent and pretext. As the Second Circuit explained, "[e]vidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive." *Hollander* v. *Am. Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir. 1990). *See also Carter* v. *Logan Bus Co.*, 2016 U.S. Dist. LEXIS 129149, at *5 (E.D.N.Y. Sep. 19, 2016) (citing *Hollander*, 895 F.2d at 84-85) (recognizing the "routine use of circumstantial evidence of a pattern of discrimination to support an individual disparate treatment claim.").

Accordingly, Defendants' challenge to Plaintiff's allegations should be rejected since they are admissible for the purposes of demonstrating background, corporate culture, discriminatory intent, pretext, liability and knowledge. This includes the following allegations:

1. allegations of discriminatory treatment of other female and/or Asian employees including against Asian employees in the Hong Kong office and Ms. K in Compl. ¶ 39, and against a female employee who left the firm because of discrepancies in GP carry interests offered to male and female employees of the same team at the same level in Compl. ¶ 43; male employees not being disciplined for unethical acts versus females being disciplined for less severe acts in Compl. ¶ 101 and 114. Defs.' Mem. 8, 25;

2. allegations of discriminatory treatment against Mr. N for his Chinese accent in Compl. ¶ 31(h). *Id*. 9, 22-23;

3. allegations of religious discrimination whereby Murphy pressured H to hire Mormon people who had no relevant experience and that another employee O expressed that PA should stop hiring underqualified employees because they are Mormon in Compl. ¶ 26 and 52. *Id*. 33;

4. allegations of unequal pay between similarly situated male and female employees performing equal work under similar working conditions in Compl. ¶ 175. *Id*. 34; and

5. allegations of a pattern of discrimination that also impacted "other employees" in Compl. ¶ 206 and were committed against "other women" in Compl. ¶ 219. *Id*. 37.

**D.     PREGNANCY DISCRIMINATION AND SEXUAL HARASSMENT ARE NOT SEPARATE CLAIMS**

The Court should reject Defendants' attempt to obfuscate Plaintiff's sex discrimination claim by improperly separating out allegations of pregnancy discrimination and sexual harrassement as distinct, standalone claims in order to claim that there are no timely claims with respect to these two types of allegations which therefore should be stricken. Defs' Mem. 5-7, 26-31. Defendants wrongly

attack a "straw man" as Plaintiff's FAC does not bring separate claims for pregnancy discrimination and sexual harassment. Rather, Plaintiff's FAC presents allegations of sexual harassment and pregnancy discrimination clearly under the heading of "Background Facts Relating to Sex Discrimination, Harassment and Hostile Work Environment" and uses such claims to illustrate the sexist corporate culture and working environment at PA and as background evidence to show PA's failure to remedy PA's pervasive sexist culture and sex discrimination against Plaintiff.

## E.   INAPPOSITE CASES FOR MOTION TO STRIKE SHOULD BE DISREGARDED

Defendants quote *In re Methyl Tertiary* 402 F.Supp.2d at 437, in support of alleged definitions of "immaterial" and "impertinent" in the context of Rule 12(f). Defs.' Mem. 15. However, *In re Methyl* is an entirely inapposite case in which the court granted the motion to strike plaintiff City of Fresno's prayer for attorneys' fees under California Code of Civil Procedure §1021.5 because plaintiff is a public entity suing private defendants and §1021.5 does not permit award of attorneys' fees to public entities.

Defendants then quote from *Cabble* v. *Rollieson*, No. 04–CV–9413, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006) to establish the definition of "scandalous" in the context of Rule 12(f). Defs.' Mem. 15: "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Cabble* does not support Defendants' position because the case involved claims of false arrest, false imprisonment, malicious prosecution, negligence, defamation, and intentional infliction of emotional distress by plaintiff after plaintiff had been falsely accused of rape, and the court *denied* the motion to strike plaintiff's complaint, reasoning that "while the allegations certainly are not flattering to Defendant, they do not rise to the level of scandalous." *Cabble*, 2006 WL 464078, at *11. Defendants repeatedly

14

make conclusory contentions that Plaintiff's allegations are scandalous without any support as to how, even under the definition they provide, Plaintiff's allegations could be deemed scandalous.

Similarly, Defendant's citation of *Garza* v. *Univ. of Conn. Med. Health Ctr.*, No. 3:09-CV-915(VLB), 2010 WL 2011031, at *1 (D. Conn. May 18, 2010), does not support Defendants' position. In *Garza*, this Court *denied* the defendants' motion to strike, which was based on the defendants' contention that the plaintiff's complaint was lacking specificity and prolixity and was thereby immaterial, impertinent and scandalous. Defs.' Mem. 15.

In moving to strike allegations of comments made by non-decision-makers, Defendants cite *Rajaravivarma* v. *Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 153 (D. Conn. 2012), a ruling on a motion for summary judgment. Defs.' Mem. 16. The Second Circuit's observation regarding stray remarks by non-decision-makers being rarely given great weight speaks to the strength and import of the evidence, *not* its admissibility. Similarly, *Naumovski* v. *Norris*, 934 F.3d 200, 216 (2d Cir. 2019), related to a motion for summary judgment, and Defendants erroneously conflate weight versus admissibility of evidence. In fact, in both *Rajaravivarma* and *Naumovski*, the District Court had permitted the admission of "stray remarks" by non-decision-makers as evidence and the Second Circuit did not rule that the evidence was inadmissible. Therefore, Defendants' argument that the Court should strike comments by Mr. B, H and Mr. L, who were Managing Directors (the highest level and title at PA), because they allegedly were not decision makers should be rejected.

Defendants cite another inapposite case, *Smith* v. *Hochul*, 568 F. Supp. 3d 190, 196 (N.D.N.Y. 2021), which involved a class action suit, to argue that Plaintiff has no standing to assert allegations on behalf of other employees. Plaintiff's allegations of discrimination against other employees are

admissible as evidence that demonstrate discriminatory intent, corporate culture and pretext as more fully described above, and there is no issue of standing.

Defendants also seek to strike paragraph 31(i) of the FAC, inaccurately claiming that the allegation, "PA has a pattern and practice of discriminating against Asian employees" "does not relate to Plaintiff . . .," when clearly it relates to Plaintiff, who is Asian. While, as stated in *United States* v. *City of New York*, 717 F.3d 72, 83 (2d Cir. 2013) "pattern-or-practice" theory is generally used in class action suits, Plaintiff's use of the phrase "pattern and practice" in the FAC is only meant to be descriptive, and is used interchangeably with the word "pattern." Plaintiff is not bringing a class action suit for which the "pattern-or-practice" theory of law generally applies, and has not proffered to apply the "pattern-or-practice" legal theory. This Court in *Jansson* v. *Stamford Health, Inc.*, No. 3:16-cv-260, 2017 WL 1289824, at *6 (D. Conn. Apr. 5, 2017), did not strike any claim based on labels or legal theories at the pleading stage when determining whether an action states a viable claim, but rather focused on the factual allegations of the complaint to determine the nature of the claim that was being pled, citing *Sabilia* v. *Richmond*, No. 11-739, 2011 WL 7091353, at *26 (S.D.N.Y. Oct. 26, 2011) (holding that even though "plaintiffs did not label these allegations as a breach-of-contract claim [this] is not fatal to their pleading, since we must look to the factual allegations of the complaint as defining the nature of the claim rather [than] depend upon the legal labels affixed to those factual allegations") (citation omitted) and *Simonton* v. *Runyon*, 232 F.3d 33, 36-37 (2d Cir. 2000) ("[G]enerally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim.") (citation and internal quotation marks omitted).

**F.      ADMISSIBLE EVIDENCE DOES NOT REQUIRE AN ADVERSE ACTION OR ACTIONABILITY**

Defendants erroneously argue that Plaintiff's allegations that are not of an adverse employment action are not actionable and therefore should be stricken under Rule 12(f). Defs. Mem. 19. First, an allegation does not by itself require an adverse employment action or actionability in order to be admissible as evidence – Plaintiff's allegations that may not on their own rise to the level of an adverse action may still be admissible for background evidence to demonstrate discriminatory intent, pretext and corporate culture in connection with an adverse event. Second, Defendants improperly seek to isolate each bad act as if each such act should be treated separately in a vacuum, when these facts are presented by Plaintiff to be considered in totality to demonstrate a hostile work environment, which, the Second Circuit has ruled, constitutes an adverse employment action. *Alfano* v. *Costello*, 294 F.3d 365, 373 (2d Cir.2002). In addition, the Second Circuit required that "the victim must also subjectively perceive that environment to be abusive." *Id*. at 374 (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Consequently, Plaintiff's claim that she felt "trapped in an impossible situation" and considered taking leave under the FMLA due to stress are relevant to her hostile work environment claim. The Court should reject Defendants' attempt to disaggregate Defendants' various bad acts against Plaintiff, as Plaintiff may show "that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz* v. *Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation and internal quotation marks omitted). "[C]ourts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera* v. *Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (citation, internal quotation marks and alterations omitted). When the totality of

Eisenberg's treatment of Plaintiff is considered, including, but not limited to, yelling, swearing at

Plaintiff, applying harsher standards and constant abuse, dismissing her with glares and hand

gestures, threatening to terminate Plaintiff, taking credit for Plaintiff's work, giving Plaintiff tasks

that were designed to fail, spreading a false rumor about Plaintiff's bathroom habits and the litany of

other bad acts committed by other Defendants and other PA employees, Plaintiff has sufficiently met

the legal standard for demonstrating a hostile work environment.

      Defendants also make a similar argument that because small salary increases by themselves

are not adverse actions, Plaintiff's claims of discriminatorily receiving lower rates of increases in

compensation should be stricken as not actionable. As explained above, allegations do not have to be

of an adverse employment action in order to be admissible as evidence – Plaintiff's allegations that

may not on their own rise to the level of an adverse action may still be admissible for background

evidence to demonstrate discriminatory intent, pretext and corporate culture.

      Because allegations do not have to be actionable in order to be admissible, and courts consider

allegations in totality for hostile environment claims, there is no merit to Defendants' requests to

strike the allegations in Compl. ¶¶ 27 (a)-(c), 28, 29, 35, 41, 53-55 and 59-60 (Defs.' Mem. 19-20 &

25-28).

## G.    RELEVANCE OF SEXUAL HARASSMENT TO SEX DISCRIMINATION CLAIMS

      Plaintiff provides incidents of sexual harassment to demonstrate a hostile work environment

and a sex discrimination claim that encompasses not only sexual harassment but also includes

unequal pay, slower rate of promotion, retaliation and termination, as the Courts permit. Thus, Mr. A's

actions[6] are relevant. They are not just "isolated instances" that must be ignored (Defs.' Mem. 27),

but instead are part of a pattern of misconduct that PA tolerated from not only Mr. A, but also from

---

[6] Defendants question the intent behind the deletion of the details regarding Mr. A's harassment of Plaintiff. Simply put, the allegations were deleted at Defendants' request. Plaintiff is ready to add the details of Mr. A's harassment of Plaintiff in an amended complaint, if required.

Mr. B, Mr. E and Mr. L. Other sexual harassment that PA tolerated is relevant as background evidence, and as evidence of company culture, hostile environment and discriminatory animus. There is no requirement that each instance of misconduct establish employment discrimination or sexual harassment within the statute of limitations. Plaintiff's allegations of sexual harassment by Mr. A and other male employees contained in Compl. ¶¶ 27 (a)-(c), 28 and 29 are proper and permissible.

"Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment . . . " *O'Rourke* v. *City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001). Defendants quote *Carrero* v. *New York City Hous. Auth.*, 890 F.2d 569, 577-78 (2d Cir.1989), to support their irrelevant argument that for conduct to itself be actionable, the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." But the very next statement in *Carrero* is that "[w]hether the sexual harassment constitutes a Title VII violation is determined from the totality of the circumstances." *Id*. at 578. Here, other sexual harassment incidents are part of the totality of the circumstances.

Defendants also invite the Court to apply the wrong standard. Plaintiff need not allege that the acts of harassment made her working conditions intolerable. Defendants cite *Terry* v. *Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003), but the court in *Terry* wrote that "we have repeatedly cautioned against setting the bar too high, noting that [w]hile a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Id.* at 148 (citations and quotations omitted). The environment need not be "unendurable" or "intolerable." *Id.* Nor must the victim's "psychological well-being" be damaged. *Fitzgerald v. Henderson,* 251 F.3d 345, 358 (2d Cir. 2001). In short, "the fact that the law requires harassment to be severe or pervasive before it can

be actionable does not mean that employers are free from liability in all but the most egregious cases." *Whidbee* v. *Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 70 (2d Cir. 2000)."  (citations and quotations omitted). *See also Terry*, 336 F.3d at 148.

Furthermore, where as here a plaintiff's sex discrimination claim includes tangible employment actions (*e.g.,* Plaintiff's slower rate of promotion, slower increase in compensation and termination), the Second Circuit has held that courts should look

> to a wide variety of (often subtle) indications that a consideration prohibited by Title VII played a role in the conduct. And the absence of any direct evidence of discriminatory intent does not by itself defeat the suit. See, e.g., *Tarshis* v. *Riese Org.*, 211 F.3d 30, 35-36 (2d Cir.2000) (observing that employment discrimination plaintiffs "more often than not must depend on the weight of circumstantial evidence"); *Chertkova* v. *Connecticut Gen. Life Ins., Co*., 92 F.3d 81, 91 (2d Cir.1996) (cataloging circumstances that may give rise to an inference of discrimination).

*Gregory* v. *Daly*, 243 F.3d 687, 695 (2d Cir. 2001).

The Second Circuit applied these principles to allegations of hostile work environment discrimination, noting that as the Supreme Court said in *Oncale* v. *Sundowner Offshore Servs*., 523 U.S. 75, 80-81, 140 L.Ed.2d 201 (1998), neither "sex-specific and derogatory terms" nor any evidence that "sexual desire" motivated the harassment is needed to prove an actionable hostile work environment. *Gregory*, 243 F.3d at 695. Courts have found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, such as dissemination of untrue rumors about the plaintiff, attack the plaintiff's competence and contribute to hostile work environment sex discrimination. *See Howley*, 217 F.3d at 145, 148, 154–55. As in *Gregory* 243 F.3d at 695, the sex-based character of much of Mr. A, Mr. B, Mr. E and Mr. L's behavior permits the inference that the remainder of Defendants' harassing conduct, including criticizing her on her personality and having harsher standards, was also due to Plaintiff's sex. And thus Mr. A's non-sex-based harassment in the form of criticizing Plaintiff's work and personality which were revealed year after year at

Plaintiff's annual reviews, which affected Plaintiff's compensation, promotion and reputation, were contributing factors in Plaintiff's sex discrimination claims.

When Plaintiff's allegations relevant to sex discrimination are considered in totality, the facts become clear that there was a long, continuous pattern of sex discrimination: first, between 2007-08, Mr. A sexually harassed and retaliated against Plaintiff when Plaintiff rebuffed his advances; Mr. A then continued to maliciously criticize Plaintiff's performance on specific business transactions and at annual reviews in 2009, 2010 and 2011 where his name was specifically mentioned as the person who described Plaintiff as "difficult to work with"; on or about 2010-11, Plaintiff reported Mr. A's sexual harassment to Eisenberg but Eisenberg took no action to remedy the situation; between 2009-11, Mr. B, Mr. A's direct supervisor looked at Plaintiff up and down whenever she went to his office for work-related matter; on or about 2009, Mr. E sexually harassed Plaintiff to unwanted touching; in 2012, Defendants reduced Plaintiff's bonus for taking maternity leave and told her that her bonus was cut because whe went on maternity leave which Plaintiff then reported to Eisenberg; in 2013, Plaintiff discovered that Mr. J, a white male employee who had the same title as Plaintiff and joined PA only about one month prior to Plaintiff, received higher compensation than Plaintiff; in 2014, a white male who was hired as a Senior Compliance Associate less than one year prior and was far less qualified, was promoted to Chief Compliance Officer; in 2014, Plaintiff again reported Mr. A's sexual harassment to Eisenberg and the Management Committee again did not take action – Mr. A was continuously promoted through the years and to the highest position and title of Managing Director in 2014; in 2014 when Plaintiff expressed her disappointment with her bonus being cut because of maternity leave, Eisenberg became furious and demanded that she review Plaintiff's self-evaluation going forward; Plaintiff observed the CCO witness, but ignore, employees disparaging people making sexual harassment allgations; in or about 2016, Mr. L subjected Plaintiff to unwanted touching; in

2017, Mr. L gave a firm-wide presentation displaying images of Hello Kitty in an S&M outfit and bent over in a bow with the Japanese "rising sun" rays radiating out of its anus and the Defendants and the Management Committee failed to discipline him appropriately; in 2019, a female employee left PA because of the discrepancy in compensation between her and other male employees of the same team at the same level; and throughout Plaintiff's tenure at PA, Plaintiff was continuously paid less in compensation, given smaller percentages of GP stake, and not offered PA equity compared to similarly situated male employees.

Defendants cite *Naumovski* to argue incorrectly that "allegations against Mr. A should be stricken because they are not sufficient to establish employment discrimination or sexual harassment, even if they were timely." Defs. Mem. 27. As explained above, Plaintiff is not bringing an action against Mr. A for sexual harassment, but alleging that Mr. A's sexual harassment is background evidence supporting Plaintiff's sex discrimination and hostile work environment claims. But even if Mr. A's actions were considered in isolation from the numerous sex discrimination incidents stated in the FAC, *Naumovski* is inapposite, as the fact pattern in *Naumovski* is substantially less severe than Plaintiff's allegations against Mr. A. In *Naumovski*, the plaintiff's evidence of sex discrimination prior to her termination was based on one comment about plaintiff that "her 'problem' was that she was a single female in her mid-30s" and a rumor about her inappropriate relationship with a college student on the team she was coaching, compared to Plaintiff's fact pattern that included multiple incidents of sexual assault, ongoing verbal harassment, retaliation, and her supervisors' inaction when she reported such harassment. Defendants' argument that Mr. A's actions, including unwanted kissing on the mouth on two occasions which amount to sexual assault, are irrelevant to Plaintiff's sexual harassment claim, mirrors Defendants' corporate culture that disregards basic safety for women, let

alone equality for women. Defendants' position that the allegations against Mr. A, even if taken as factually true and timely, can be ignored is exactly what led to a hostile environment.

## H.   PLAINTIFF HAS STATED CLAIMS UNDER COUNTS FOUR, FIVE, SIX, EIGHT AND NINE - DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED

Plaintiff has stated claims under Counts Four, Five, Six, Eight and Nine, notwithstanding Defendants' erroneous contention that allegations that are time-barred or unlimited in time, allegations regarding discriminatory actions against other employees, and allegations that are not independently actionable must be stricken (Defs.' Mem. 29, 31-32). Because the allegations that Defendants propose be stricken are viable and admissible, Defendants' argument that these Counts should be dismissed in their entirety is baseless. In addition to the numerous factual allegations that support her claims under Counts Four, Five, Six, Eight and Nine, Plaintiff independently states her claims clearly under each Count. *See* Compl. ¶¶ 95-106 with respect to Count Four; Compl. ¶¶ 107-119 with respect to Count Five; Compl. ¶¶ 120-131 with respect to Count Six; Compl. ¶¶ 145-157 with respect to Count Eight; and Compl. ¶¶ 158-171 with respect to Count Nine.

Defendants also seek to strike and dismiss claims that are "unlimited in time" with respect to Plaintiff's claims regarding hostile environment, pay and promotion, discrimination based on sex, national origin, race and religion. However, these allegations are of continuous and ongoing wrongdoing - up until the day of her termination, Plaintiff was subjected to a hostile work environment and paid and promoted less than her white, Mormon, male comparators. The allegations of discrete incidents whereby Plaintiff discovered, complained about, or was subjected to discrimination and unequal pay and promotion continued into the applicable statute of limitations periods. In fact, Plaintiff pleads specifically under each Count Four, Five, Six, Eight and Nine that the series of continuous adverse employment actions described in the FAC were continuous, consistent and constant, including with respect to decisions made regarding Plaintiff's compensation, salary,

bonuses, advancement, entitlement to equity (in the firm and GP stakes) and the termination of

Plaintiff's employment. And ultimately, the irrefutable fact of Defendants' terminating Plaintiff the

day after Plaintiff filed this lawsuit undeniably occurred within the statute of limitation with respect

to each of these Counts.

Notwithstanding the undeniability of Plaintiff's termination having occurred within the statute

of limitations for each of these Counts, Defendants erroneously contend that Plaintiff's allegations

with respect to the EPA and CPEA should be stricken because they are  unlimited in time, as should

all allegations pre-dating June 27, 2019. Defs.' Mem. 34-35. Defendants' argument must be rejected.

## I.    PLAINTIFF STATES SUFFICIENT FACTS TO MAKE EPA AND CPEA CLAIMS

Defendant incorrectly argues that Paragraph 187 of the FAC should be stricken because

Plaintiff has failed to allege any particular ways in which the PA acted intentionally, or with reckless

indifference for Plaintiff's rights. Defs.' Mem. 35. In *Kolstad* v. *American Dental Ass'n*, 527 U.S.

526, 529-30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court stated that malice and

reckless indifference refer to "the employer's knowledge that it may be acting in violation of federal

law, not its awareness that it is engaging in discrimination." *Id*. at 535, 119 S.Ct. 2118; *see also*

*Weissman* v. *Dawn Joy Fashions*, 214 F.3d 224, 235 (2d Cir. 2000). Defendant PA, an asset manager

with $38 billion dollars under management, having conducted business in Connecticut for the past 28

years with a team of no less than ten attorneys and compliance officers and sophisticated top-tier

outside law firms, would be hard pressed to argue that it lacked knowledge of the requirements under

the EPA and the CPEA. Furthermore, Plaintiff had complained to Eisenberg and other members of the

Management Committee that she was being paid at an under market rate, in part because of her race

and sex, and thereby put Defendants on notice as to her expectation of equal pay. As such, Plaintiff's

claim that Defendant PA acted intentionally or with reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to punitive damages, is sufficient.

Furthermore, contrary to Defendants' claim that Plaintiff failed to allege any particular ways in which PA acted intentionally, or with reckless indifference, Plaintiff has provided numerous allegations supporting her claim that Defendant acted intentionally or with reckless indifference as shown below. The same set of facts also negate Defendants' argument that Plaintiff offered nothing more than conclusory assertion that PA paid her less than unnamed similarly situated male employees.

As an initial matter, Plaintiff is not required to prove a prima facie EPA case in order to survive a motion to dismiss but rather must plead facts that make it plausible that Defendants violated the EPA. *Crawley* v. *Macy's Retail Holdings, Inc.*, No. 15 Civ. 2228 (KPF), 2016 WL 6993777, at *9 (S.D.N.Y. Nov. 29, 2016). Courts have long held that "[p]laintiffs and their comparators need not have "identical" jobs, but a higher-paid comparator should not hold a job requiring "greater skill, effort, and responsibility than [the] plaintiff's position." *Moazzaz* v. *MetLife, Inc.*, No. 19 Civ. 10531 (JPO), 2021 WL 827648, at *4 (S.D.N.Y. Mar. 4, 2021), citing *Lavin-McEleney* v. *Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001).[7]

---

[7] Defendants rely heavily on *E.E.O.C.* v. *Port Auth. of N.Y. & N.J.*, 768 F.3d 247 (2d Cir. 2014) citing it seven times in Defs.' Mem. 35-37. Defendants, however, omit numerous subsequent cases in which courts have distinguished *E.E.O.C.* as an exceptional ruling and even questioned the appropriateness of the case as a guide. In *Chiaramonte* v. *Animal Med. Ctr.*, No. 13 Civ. 5117 (KPF), 2014 WL 3611098, at *6 (S.D.N.Y. July 22, 2014) the court described *E.E.O.C.* as "an unusual case" in which the court concluded that the EEOC's theory of the case was no more than an argument that "an attorney is an attorney is an attorney," and that "a listing of ... abstract generalities" fell short of the requirement of providing "a true comparison of the content of the jobs at issue." and further stated that "[t]here is some question whether *E.E.O.C.* is any guide at all, given its unusual posture." *See also Mitchell* v. *Ceros, Inc.*, No. 21 Civ. 1570 (KPF), 2022 WL 748247, at *6 (S.D.N.Y. Mar. 10, 2022) (highlighting *E.E.O.C.* as an exception: "Indeed, courts in the Second Circuit have only rarely dismissed Equal Pay Act claims on the pleadings, most notably when the complaint "stat[es] nothing about the actual content of the work done by the [employees compared]." *Moazzaz* v. *MetLife, Inc.*, No. 19 Civ. 10531 (JPO), 2021 WL 827648, at *4 (S.D.N.Y. Mar. 2021) (quoting *E.E.O.C.*, 768 F.3d at 251 (emphasis removed))"). *See also Moazzaz*, 2021 WL 827648, at *6 ("Perhaps unsurprisingly, given the broad array of factors that bear on "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes," this fact-intensive analysis is typically conducted after discovery and treated as "a question for the jury." *Lavin-McEleney*, 239 F.3d at 480.")

In support of her claims in Compl. ¶ 187 and under EPA and CPEA, Plaintiff has provided the

following facts and allegations in the FAC.

A. <u>Allegations beyond three years (assuming wilful discrimination) with respect to Plaintiff's EPA and CPEA claims, admissible as background evidence demonstrating Defendant PA's intentional and reckless disregard for Plaintiff's rights and wilful discrimination:</u>

1. Compl. ¶ 30: Plaintiff worked throughout her maternity leave but that same year, Crotty told Plaintiff that her bonus was cut because she went on maternity leave;

2. Compl. ¶ 33: Plaintiff told Eisenberg that she was not being paid fairly because in part she was female, to which Eisenberg reacted by telling Crotty that Plaintiff had "ambushed her";

3. Compl. ¶ 34: Mr. J, a white male employee who was hired at the same time as Plaintiff in PA's Legal Team, was receiving higher percentages of carry interests/GP stakes, salary and bonus[8]; and

4. Compl. ¶ 40: "[I]n Plaintiff's December 2016 self-evaluation, she wrote that it was disappointing to have her bonus cut when she took her first maternity leave, Ms. Eisenberg called Plaintiff into her office upon reading Plaintiff's self-evaluation, furious about these comments and demanded that going forward, she would have the right to review and approve Plaintiff's self-evaluation before submission to the Management Committee."

B. <u>Factual allegations within three years showing different wages to opposite sex</u>:

1. Compl. ¶ 35: "[A] white male Mormon who started as an analyst, the most junior level at the firm, seven months after Plaintiff joined PA, was promoted at a much faster rate than she was, granted PA equity ownership again and received a higher rate of increase in compensation than Plaintiff;"

2. Compl. ¶¶ 36-37: a male employee less qualified than Plaintiff and poor performer was promoted to CCO and received PA equity despite Plaintiff raising concerns regarding the CCO's performance to Defendants on numerous occasions between 2014 - 2021;

3. Compl. ¶ 38: "the discrepancy of compensation (including salary, bonus, PA equity units and GP carry interests) between . . . male versus female . . . is discriminatory";

---

[8] 29 C.F.R. § 1620.10 (2017). Under the EPA, the term "wages'" generally includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus . . . or some other name. Fringe benefits are deemed to be remuneration for employment . . . ."

4. Compl. ¶ 41: Plaintiff's promotions were in title only, "with increase in compensation that were not comparable to others similarly situated and no offer to buy equity in PA, while male employees were promoted to Senior Vice Presidents, received benefits including the opportunity to buy equity in PA . . . .";

5. Compl. ¶ 43: "Other female employees left the firm in 2019 because of discrepancies between the amounts of GP carry interests offered amongst certain members of the same team at the same level.";

6. Compl. ¶ 51: "PA singled out Plaintiff in *continuous and ongoing* discriminatory actions by failing to promote Plaintiff to SVP and offer of PA equity year after year compared to similarly situated white men . . . .  [emphasis supplied.] Other white, male and/or Mormon employees were promoted to SVP significantly earlier and at a faster pace than Plaintiff, and to Managing Director, while it took Plaintiff over 14 years to get promoted to SVP, and Plaintiff was then further singled out with respect to the PA equity offer among the recently promoted SVP cohort [in 2022]." Plaintiff was continuously denied an opportunity to participate in purchasing PA equity in the past three years because PA discriminated against her based on race, sex and religion on continuous and ongoing basis; and

7. Compl. ¶ 45: A promotion to SVP was economically meaningful because every employee at the SVP level was offered an opportunity to buy PA equity.

C. Factual allegations that demonstrate equal skill, effort and responsibility.[9]

1. Compl. ¶ 13: Plaintiff graduated from Yale University in 2001 with multiple honors, including summa cum laude, Phi Beta Kappa and the William Belknap Prize – a scholarship prize awarded to a Yale graduate for academic excellence in biological sciences; received a Juris Doctor degree from Yale Law School in 2005 with honors; and worked as a lawyer at Latham & Watkins, LLP for two years;

2. Compl. ¶ 14: As shown by Plaintiff's educational and work background prior to her employment with PA, Plaintiff has always worked extremely hard on each task and responsibility at hand and continued to do so as an employee of PA;

3. Compl. ¶ 18: "[Plaintiff] has managed and been involved in the majority of investments of PA's sponsored funds and clients. The investments which Plaintiff handled have generated hundreds of millions of dollars in profit, fees and carried interest for PA . . . .";

---

[9] "The EEOC's regulations also define the statutory criteria underlying the equal work inquiry—equal skill, effort, and responsibility—by reference to actual job content. For example, equal skill is defined as including "such factors as experience, training, education, and ability," as measured "in terms of *the performance requirements of the job*" at issue. 29 C.F.R. § 1620.15(a) (emphasis supplied). Equal effort, by turn, looks to "the measurement of the physical or mental exertion *needed for the performance of a job.*" *Id.* § 1620.16(a) (emphasis supplied). And equal responsibility turns on "the degree of accountability *required in the performance of the job,* with emphasis on the importance of the *job obligation.*" *Id.* § 1620.17(a) (emphasis supplied).

4. Compl. ¶ 19: Eisenberg has acknowledged and praised Plaintiff's skill, effort and responsibility on multiple occasions by making comments such as, "You know that I think the world of you," "You are brilliant," "I rely and depend on you," "The sheer volume of work that crosses your desk is mind boggling," and "Your attention to detail, your ability to think critically and spot issues meet the highest levels." "Ms. Eisenberg made similar positive comments with respect to Plaintiff's performance in front of PA's Management Committee, and at Plaintiff's performance reviews, year after year.";

5. Compl. ¶ 19: The investment professionals including "Jorge Rosello, Timothy Henn and Patrick Gerbracht (Senior Vice Presidents and Managing Director who worked closely with Plaintiff ) told Plaintiff that the business people on the Secondaries Team have expressed concern that if Plaintiff . . . were to leave PA, it would be a "complete shit show" as the closing of transactions would be seriously jeopardized." At the December 2021 firm-wide annual presentation, numerous business teams gave Plaintiff shout-outs, thanking her and recognizing her value-add to getting large volumes of transactions done and that they could not have done it without her;

6. Compl. ¶ 20: "[F]or nearly 15 years, Plaintiff worked after business hours, weekends and during vacation. She also worked during her maternity leaves in 2012, 2014 and 2016 and made herself fully available to her team whenever they needed to reach her. During her first three years at PA, she took only a couple of sick or personal days. She rolled over vacation days most years because she was always so busy and could not take all of the vacation days allotted to her and often worked during her vacations. She often sacrificed her time with her family and children during vacations and, especially during the month of December, in order to make sure that deadlines were met and that the work product was excellent."; and

7. Compl. ¶ 56: In 2021, Plaintiff received 360 degree reviews that were "amazing" and "very impressive" in Eisenberg's words.

If the Court concludes that Plaintiff has not sufficiently detailed her equal pay claims, she must be granted leave to amend to state them, whereby she can specifically name the male employee or employees with jobs requiring essentially equal skill, effort and responsibility who are alleged to have received greater compensation within the last three years than she did, and providing detail of the job content in order to demonstrate that the "jobs compared entailed common duties or content." *Corpes v. Walsh Constr. Co., No. 3:14-CV-181 (MPS)*, 2015 WL 5331725, at *5 (D. Conn. Sept. 14, 2015).

Rule 15 provides that "[t]he court should freely" grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). In considering whether to grant a litigant leave to amend, the Court considers such factors as undue delay, bad faith, dilatory motive, undue prejudice, and futility of amendment. See *Foman* v. *Davis*, 371 U.S. 178, 182 (1962); see also *Block* v. *First Blood Assocs*., 988 F.2d 344, 350 (2d Cir. 1993) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith."). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd.* v. *Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (internal citations omitted). . ."Undue prejudice arises," for example, "when an amendment comes on the eve of trial and would result in new problems of proof." *Id*. (quoting *Fluor Corp*., 654 F.2d at 856) (internal quotation marks and alteration omitted). Nonetheless, "allegations that an amendment will require the expenditure of additional time, effort, or money do not themselves constitute undue prejudice." *Fresh Del Monte Produce, Inc.* v. *Del Monte Foods, Inc.*, 304 F.R.D. 170, 174-75 (S.D.N.Y. 2014) (internal citations omitted). Therefore, "the fact that the opposing party will have to undertake additional discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading." *Id*. (quoting *U.S. ex rel. Mar. Admin.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989)).

*Verdone* v. *Am. Greenfuels, LLC*, No. 16 Civ. 01271, 2017 WL 3668596, at *2 (D. Conn. Aug. 24, 2017). Here, there is no prejudice or undue delay – this case was recently filed, no initial disclosures made, no discovery taken, and no trial date set. Consequently, amendment must be permitted.

Plaintiff truncated her complaint to accommodate Defendants' confidentiality and Rule 8 concerns, but given the conflicting interests at hand, Plaintiff is readily able to provide further factual allegations to demonstrate that Plaintiff performed equal work on one or more jobs that required equal skill, effort and responsibility as her male comparator(s) who received higher pay as provided below.

One apt comparator to Plaintiff is Dan Dwyer, the Chief Compliance Officer whose job, skill, effort and responsibility were similar or inferior to Plaintiff. Plaintiff had handled a significant amount of compliance work from 2007 until 2013, when Dwyer was hired to take over the compliance functions of the PA Legal Team. However, Dwyer failed to take ownership of various compliance matters such as anti-money laundering ("AML") and ERISA compliance, which then

remained on Plaintiff's shoulders even though Eisenberg, the Management Committee and outside counsel understood those responsibilities to be squarely within compliance functions.

Dwyer graduated from Connecticut College and Willamette University College of Law without any distinction and lacked top tier law firm experience. He has 11 years of unexplained gap in his work experience and prior to joining PA, his tenure at the three prior positions were two years, one and one year, respectively. Dwyer had very little knowledge of the types of investments that were made or whether applicable compliance policies were being followed even though these responsibilities were required of him. He would ask irrelevant questions or incorrectly seek to apply inapplicable policies, revealing his lack of basic understanding of PA's investments. Murphy disclosed to Plaintiff that even ACA Compliance, the third party compliance auditors, had told Murphy that Dwyer was below average as a CCO for a company this size and that they had never encountered a CCO who was so far removed from the daily operations of the firm.

Plaintiff made numerous complaints about the CCO's poor performance over the years through 2022 to Eisenberg, Indelicato, Murphy and Clemens. As it was, Dwyer was reputed for rarely being at his desk, to not having any documents or work material on his empty desk, to going from office to office chatting up people about sports, and to going on long lunch breaks. Eisenberg also complained to Plaintiff and Jennifer Lew about Dwyer's incompetence and told Plaintiff to do Dwyer's work for him because even if he were to do it, he would do it all wrong. As such, Plaintiff have had to review and revise marketing documents, advisory board seat tracking chart, restricted securities list, track registration in foreign jurisdictions, research various compliance regulations related to PA's registered investment advisor status and broker-dealer relationships, handle AML requests and ERISA compliance matters, all of which Eisenberg and others at PA understood to be Dwyer's responsibilities.

Other PA employees also complained about Dwyer for constantly punting off his responsibilities on others, failing to meet deadlines, for being sloppy in all his written communications and unresponsive to emails, and gossiping about confidential personnel matters. And yet, Dwyer was given executive functions, trusted with highly confidential information, and awarded PA equity. After years of internal discussions, the Management Committee determined that based on market practice and inefficient use of attorney time on AML matters, Dwyer's Compliance Team should handle AML matters. In order to transition the AML work that Plaintiff handled, Dwyer hired a full-time AML officer and punted the training and managing of AML related work to yet another female employee, Bianca Bucci who is a member of the Marketing and Client Services Team and had no experience or knowledge of AML matters.

In addition to AML related work within compliance, Plaintiff drafted various sections of PA's compliance manual for which Dwyer never gave credit to Plaintiff. For example, Plaintiff completely revised the Primary Investment Due Diligence Policy in 2021 over a course of months along with the Primary Investments team members and obtained multiple feedbacks from them to make it more efficient. Dwyer contributed nothing to the Due Diligence Policy but took credit for all the work as he claimed that the compliance manual was a product of his work. Plaintiff also assisted in drafting the primary investment allocation policy, the secondaries and co-investment policy, the CFTC policy, Korea registration policy and the ERISA compliance policy. Even when Plaintiff sought to work with Dwyer on outdated policies, Dwyer failed to respond or make the appropriate changes Plaintiff highlighted to Dwyer.

Plaintiff and Dwyer at times attended the same Investment Committee meetings to discuss and opine on legal and business terms in the operating agreements, ascertain compliance with all applicable internal policies, such as the allocation policy, conflicts of interest policy and the primary

investment due diligence policy. In working with Dwyer, Plaintiff's job tasks and content required the same or exceeded skill, effort and responsibility as his. Plaintiff had the same or superior "skill" in terms of experience, training, education and ability – Plaintiff had worked in the same industry and legal practice for over a decade, had received education and training from top tier schools and law firms even prior to joining PA, and displayed ability that even Eisenberg or other PA employees could not deny. Plaintiff exerted tremendous physical and mental "effort" to work long hours without rest and during her personal times on vacation, holidays and maternity leaves; read through thousands of pages of documents each week, spotting big picture legal issues to catching typos to perfect the documents; participated in numerous meetings and video conferences with investment professionals. With respect to "responsibility", Plaintiff was held accountable to timely closing each deal that she worked on as she was involved in the closing process. Numerous eyes were on her work product including outside experts. And often, Plaintiff and Dwyer "assisted one another, worked together, and communicated with each other multiple times per day" as this Court emphasized in *Corpes*, 2015 WL 5331725, at *5 as an important factor in meeting the "substantially equal work" element (in denying defendants' motion to dismiss based on the argument that plaintiff had failed to state an EPA claim).

## J.    PLAINTIFF STATES A CLAIM FOR THE VIOLATION  OF C.G.S.A. SEC. 31-51q

### 1.    Plaintiff States a Claim that Defendant PA Illegally Retaliated Against Plaintiff Because She Engaged in Constitutionally Protected Speech in Violation of Section 31-51q

"Section 31-51q creates a statutory cause of action for damages against 'any employer' for 'any employee' who has been subjected 'to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state . . . .'" *Cotto* v. *United Techs. Corp.*, 251 Conn. 1,

6 (1999).[10] "The statute plainly was intended to protect the first amendment and related state constitutional rights of working men and women. As a remedial statute, § 31-51q deserves a generous construction that implements its purpose at one of the important places, the private workplace, in which those rights may be impaired." *Cotto*, 251 Conn. at 8-9. *See also Trusz* v. *UBS Realty Investors LLC*, 319 Conn. 175, 212 (2015) (reiterating that as a remedial statute, § 31-51q deserves a generous construction).

"To establish a *prima facie* claim, [Plaintiff] must establish: '(1) that [s]he engaged in constitutionally protected speech, (2) that h[er] employer took an adverse action against h[er], and (3) that there was a causal relationship between the protected activity and the adverse action.'" *Blue* v. *City of New Haven*, No. 3:16-cv-1411 (MPS), 2019 U.S. Dist. LEXIS 15104, at *23 (D. Conn. Jan. 31, 2019) (citation omitted). Defendants principally move to dismiss Plaintiff's § 31-51q claim on the grounds that Plaintiff fails to allege that she engaged in constitutionally protected speech. Defs.' Mem. 38-40. Since Defendants' argument is flawed and contrary to caselaw from the Supreme Court, Second Circuit and Connecticut Supreme Court, the Court should reject Defendants' argument and hold that, for purposes of her § 31-51q claim, Plaintiff sufficiently alleges that she engaged in constitutionally protected speech when she complained to state and federal agencies, and alleged in federal court, that Defendants were engaging in systemic discrimination that impacted numerous employees of Defendants, and that Defendants were operating a discriminatory corporate culture, in violation of state and federal laws.

"[I]t is within the province of the trial court to determine, as a matter of law, which topics are considered to be of public concern. The resolution of whether an employee's statements address such a topic is, however, within the province of the jury, to be determined by looking to the content, form

---

[10] Conn. Gen. Stat. § 31-51q was amended in certain respects, effective July 1, 2022.  Since Defendant PA terminated Plaintiff's employment on June 28, 2022, prior to the effective date of those amendments, the version of § 31-51q that was in effect prior to the amendments controls this action.

and context of the particular statements in question." *Daley* v. *Aetna Life & Cas. Co.*, 249 Conn. 766, 782 (1999). Since the free speech provisions of the Connecticut Constitution incorporated into § 31-51q are broader and more protective of speech than the First Amendment, *Trusz*, 319 Conn. 175, any speech that is protected under the First Amendment must also be protected under the Connecticut Constitution and § 31-51q. *Brown* v. *Office of the State Comptroller*, 456 F. Supp. 3d 370, 411 (D. Conn. 2020) (citation omitted).

For purposes of the First Amendment, it is well-established that the topic of employment discrimination is a matter of public concern.[11] *Konits* v. *Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) ("Gender discrimination in employment is without doubt a matter of public concern."); *Mandell* v. *County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003) (speech opposing racism and religious discrimination in the form of anti-Semitism is clearly a matter of public concern); *Donahue* v. *Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987) (claims of gender discrimination against plaintiff's wife address matter of public concern).

The historical nature of the anti-discrimination statutes pursuant to which Plaintiff has asserted her claims, and through which Plaintiff has spoken, should leave no doubt that the topic of discrimination is a matter of public concern, as a matter of law. *Albert* v. *City of Hartford*, 529 F. Supp. 2d 311, 333-34 (D. Conn. 2007) (identifying fact that plaintiff asserted claims under civil rights statute in concluding that lawsuit addressed a matter of public concern). For instance, in Plaintiff's Original Complaint, filed on June 27, 2022, for which Defendant retaliated against Plaintiff by terminating her employment the very next day, on June 28, 2022, Plaintiff alleged that Defendants engaged in race discrimination in violation of 42 U.S.C. § 1981, the present-day codification of

---

[11] First Amendment protection for an employee's speech opposing discrimination is not limited to complaints about employment discrimination. *See Givhan* v. *W. Line Consol. Sch. Dist.*, 439 U.S. 410, 413 (1979) (First Amendment retaliation claim based on complaints by teacher regarding policies and practices which were allegedly discriminatory). *See also Johnson* v. *Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (speech opposing harassment, discrimination, and other improper actions against employees addressed matter of public concern).

legislation enacted to combat race discrimination during Reconstruction. *Johnson* v. *Ry. Express Agency, Inc.*, 421 U.S. 454, 459 (1975).[12] The other statutes through which Plaintiff spoke in her complaint, including Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment Practices Act, first enacted in 1947,[13] similarly represent historic legislative efforts to combat discrimination in employment. The Connecticut Supreme Court has also repeatedly cited to legislative history demonstrating that § 31-51q was intended to protect employees who spoke out regarding illegal working conditions or violations of laws intended to protect workers. *Cotto*, 251 Conn. at 9-10; *Trusz*, 319 Conn. at 215.

Plaintiff's lawsuit represents constitutionally protected speech on a matter of public concern because Plaintiff's complaint is not limited to only her own personal situation. Plaintiff's federal court complaint, as well as her complaints to the CHRO and EEOC that were supported by her sworn statements, alleged that Defendants were discriminating against Plaintiff and other employees based on race, sex, religion and ethnicity through a pattern and practice of various discriminatory employment practices that infected the working environment and the corporate culture in a systemic way. Plaintiff explicitly alleged that Defendants' discriminatory employment practices impacted other employees at PA, in addition to herself, but Plaintiff's complaint goes even further. Plaintiff also explicitly connected the allegations in her complaint to societal problems of discrimination against Asian-Americans, and the intersectional discrimination faced more broadly by Asian-American women. Compl. ¶ 1. On its face, Plaintiff's complaint reflects that Plaintiff's lawsuit has a broader public purpose.

---

[12] One of the express purposes of Plaintiff's lawsuit is to combat the larger issue of discrimination against Asian-Americans. Compl. ¶ 1.  As the Supreme Court has recognized, one of the purposes of the Civil Rights Act of 1870 was to combat race discrimination against immigrant groups such as immigrants from China.  *Saint Francis Coll.* v. *Al-Khazraji*, 481 U.S. 604, 613 (1987).

[13] *Thibodeau* v. *Design Grp. One Architects, LLC*, 260 Conn. 691, 702 (2002).

It is well-established that complaints about systemic discrimination, or which include opposition to discrimination against other employees and which are not just limited to the plaintiff's own personal situation, constitute speech on a matter of public concern protected by the First Amendment. In *Saulpaugh*, for instance, the Second Circuit held that the plaintiff's internal discrimination complaint was not protected by the First Amendment because the plaintiff's complaints "were personal in nature and generally related to her own situation." *Saulpaugh* v. *Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) (citations and quotations omitted). However, the Second Circuit made clear in *Saulpaugh* that "[h]ad Saulpaugh's complaints to her supervisors implicated system-wide discrimination they would have unquestionably involved a matter of 'public concern.'" *Saulpaugh*, 4 F.3d at 143. Plaintiff's complaint in this case represents the type of opposition to system-wide discrimination that, according to the Second Circuit in *Saulpaugh*, "unquestionably involve[s] a matter of public concern." Plaintiff's complaint in this case satisfies each of the elements which the Second Circuit identified as absent from the *Saulpaugh* plaintiff's complaints. Unlike the plaintiff in *Saulpaugh*, Plaintiff's complaint makes clear that she wanted to debate issues of sex and race discrimination, that she was challenging pervasive or systemic discrimination, and "that her suit was part of an overall effort . . . to correct allegedly unlawful practices or bring them to public attention." *Id.* at 143 (quotations and citation omitted). *See also Hoyt* v. *Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006) (speech by employee was protected where it complained about unlawful actions against employees and had a " public purpose," rejecting argument that it was just an employee grievance).

Following *Saulpaugh*, the Second Circuit made it even clearer in *Konits* that speech opposing employment discrimination relates to a matter of public concern. *See Konits* v. *Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005). Like the plaintiff in *Konits*, Plaintiff's protected

activity was not limited to her own personal situation. The plaintiff in *Konits* engaged in protected activity under the First Amendment when she filed a lawsuit claiming retaliation for being previously identified as a potential witness in connection with discrimination involving another employee. *Konits*, 394 F.3d at 124-25. Because the subject matter of the initial lawsuit involved a matter of public concern, the First Amendment prohibited retaliation against the plaintiff for filing that lawsuit. *Id.* at 124 ("We have noted that if the basis for a First Amendment retaliation claim is a lawsuit, the subject of the lawsuit must touch upon a public concern."). *See also Schnabel* v. *Tyler*, 230 Conn. 735 (1994) (lawsuit claiming retaliation for prior speech on matter of public concern was also protected under First Amendment).

Consistent with *Konits*, Plaintiff's federal court lawsuit, and her complaints to CHRO and EEOC supported by Plaintiff's sworn statement, are also protected under the First Amendment because the filing of those complaints foreshadowed anticipated or potential testimony by Plaintiff. *Konits*, 394 F.3d at 125 ("speech is of particular public concern when it involves actual or potential testimony in court or in administrative procedures. Protection of the courts' interest in candid and truthful testimony, coupled with the rights of discrimination victims to seek protection in legal action, makes testimony or prospective testimony in discrimination suits a matter of particular public interest.").

Consistent with this precedent, other courts have held that an employee engages in protected speech under the First Amendment by filing a lawsuit that includes allegations of systemic discrimination. For instance, in *Albert* v. *City of Hartford*, Judge Squatrito held that the plaintiff's original federal court complaint addressed a matter of public concern because it included allegations about the employer's policies and practices, three of the four counts, were brought pursuant to civil rights statutes, and one of the counts alleged "misfeasance and discriminatory policies" indicating

37

"that the city may have a policy that implicates system wide discrimination." *Albert* v. *City of Hartford*, 529 F. Supp. 2d 311, 333-34 (D. Conn. 2007) (also recognizing that "numerous courts have recognized that such speech plainly addresses issues of public concern").

In *Kantha* v. *Blue*, 262 F. Supp. 2d 90 (S.D.N.Y. 2003), the Court held that two memoranda written by the plaintiff addressed matters of public concern because they included opposition to systemic discrimination that impacted other women in addition to the plaintiff. The fact that the plaintiff complained that other women in addition to the plaintiff had been similarly subjected to sex discrimination supported the claim for First Amendment protection. *Id.* at 102. The Court explained that "[i]t does not matter that these two memoranda also addressed Kantha's individual employment situation, because *Connick* precludes First Amendment protection for public employees when they speak 'upon matters *only* of personal interest.'" *Id.* at 102 (citations omitted). *See also Zorzi* v. *County of Putnam*, 30 F.3d 885, 897-98 (7th Cir. 1994) (lawsuit is First Amendment protected speech for purposes of retaliation claim where the lawsuit involves a matter of public concern.)

In support of their motion, Defendants argue, correctly, that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Defs.' Mem. 39. (citation omitted). Since any factual disputes regarding whether Plaintiff was motivated to speak as a concerned citizen, or as an employee set on airing a personal grievance, must be resolved by a finder of fact, *Daley* v. *Aetna Life & Cas. Co.*, 249 Conn. 766, 777-85 (1999); *Campbell* v. *Windham Cmty. Mem'l Hosp., Inc.*, 389 F. Supp. 2d 370, 382 (D. Conn. 2005), that issue cannot be resolved against Plaintiff on a motion to dismiss under Rule 12(b)(6).

2.      <u>Substantial or Material Interference Is an Affirmative Defense for Defendant to Establish, Not an Element Which Plaintiff Must Allege in Complaint</u>

Defendants incorrectly argue that Plaintiff must allege a lack of substantial or material interference in the complaint in order to state a claim under § 31-51q. Defs.' Mem. 40. If Defendants maintain that Plaintiff's protected speech substantially or materially interfered with Plaintiff's job performance or her working relationship with them, then it is Defendants' burden to establish that as an affirmative defense – Plaintiff is not required to plead that issue in the negative in her complaint. *See Matthews* v. *Dep't of Pub. Safety,* No. HHDCV116019959S, 2013 Conn. Super. LEXIS 1291, at *24-31 (Super. Ct. May 31, 2013); *Blue* v. *City of New Haven*, No. 3:16-cv-1411 (MPS), 2019 U.S. Dist. LEXIS 15104, at *28-29 (D. Conn. Jan. 31, 2019); *Bacewicz* v. *Molecular Neuroimaging LLC*, No. 3:17-cv-85-MPS, 2019 U.S. Dist. LEXIS 162355, at *32 (D. Conn. Sep. 23, 2019); *D'Amato* v. *New Haven Bd. of Educ.*, No. CV196091032S, 2020 Conn. Super. LEXIS 354, at *40 (Super. Ct. Mar. 3, 2020). However, in the alternative, if the Court disagrees, Plaintiff should be granted leave to amend to address that issue.

3.      <u>The Court Should Not Strike Allegations Supporting Plaintiff's Section 31-51q Claim</u>

Defendant's motion to strike allegations from Plaintiff's § 31-51q claim is also entirely without merit. Contrary to Defendant's assertion in Defs.' Mem. 37, none of Plaintiff's allegations in support of her § 31-51q claim are untimely, as Plaintiff has alleged that Defendant PA subjected Plaintiff to discipline or discharge within the applicable three year statute of limitations. Defendants' reliance on standing in Defs.' Mem. 12. is also baseless, as Plaintiff's complaint does not purport to bring a claim on behalf of other individuals who have similarly been subjected to discrimination. Plaintiff's speech addresses a matter of public concern, and is therefore constitutionally and statutorily protected under § 31-51q, in part because she alleges that Defendants have engaged in systemic discrimination in violation of state and federal law, and that Defendants maintain a

discriminatory corporate culture. Plaintiff notified state and federal government agencies, and alleged

in federal court, that Defendants engaged in discriminatory employment practices in violation of state

and federal law that adversely impacted other employees in addition to Plaintiff. Since Plaintiff's

allegations of systemic discriminatory employment practices and a discriminatory corporate culture

illustrate part of the reason why Plaintiff's speech addressed a matter of public concern, and are

relevant to the issue of whether Plaintiff's complaint had a broader public purpose, the Court should

not strike paragraphs 206 and 219 from Plaintiff's complaint.

## V.        CONCLUSION

The FAC states 16 claims upon which relief may be granted. The allegations of the FAC are

proper,  Defendants' Rule 12 motions lack merit and should be denied.

By:  _/s/ Charles H. Jung_                     .

Charles H. Jung (pro hac vice)
(charles@njfirm.com)
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, CA 94111
Tel.: (415) 762-3100
Fax: (415) 534-3200
Counsel for Plaintiff MICHELLE LEE

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2022, a copy of the foregoing was filed electronically.

Notice of this filing was sent by email to all parties by operation of the Court's electronic filing

system. Parties may access this filing through the Court's system.

By:  _/s/ Charles H. Jung_                     .

Charles H. Jung (pro hac vice)